

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0312-11

### RONNIE TIENDA, JR., Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

**PRICE, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

The appellant was convicted of murder.[1]  He pled true to one enhancement count, and

the jury assessed punishment at thirty-five years' imprisonment.  In an unpublished opinion,

the Fifth Court of Appeals affirmed the appellant's conviction, holding that the trial court did

not abuse its discretion in admitting evidence from MySpace pages that the State believed

---

[1] TEX. PENAL CODE § 19.02.

were created by the appellant.[2] We will affirm the judgment of the court of appeals.

## FACTS AND PROCEDURAL POSTURE

David Valadez and his two passengers were the targets of a multiple car shootout while driving southbound in Dallas on I-35E towards I-30. The shooting was apparently the product of some tension displayed between two rival groups at a nightclub earlier that evening, where members of the appellant's group were "throwing" gang signs and "talking noise" to Valadez and his friends. Shortly after Valadez and his passengers left one nightclub to head to another "after hours" club, Valadez's car unexpectedly came under gunfire from a caravan of three or four cars also traveling southbound on I-35E towards I-30. The appellant was a passenger in one of the cars in the caravan.

Testimony at trial as to the appellant's specific involvement in the shooting varied widely. The witnesses agreed that the appellant was at least present during the shooting; however, there was inconsistent testimony as to who fired the first gunshots, whether the appellant was seen merely holding a gun or actually firing a weapon, which car the appellant was riding in, and from which car the fatal shots were fired. During the exchange of fire, Valadez was shot twice, causing him to lose control and crash his vehicle into the highway's center concrete divider. Valadez died as a result of the gunshot wounds shortly after being taken to a nearby hospital. Although cartridge casings consistent with at least two weapons

---

[2] *Tienda v. State*, No. 05-09-00553-CR, 2010 WL 5129722, at \*4-5 (Tex. App.—Dallas Dec. 17, 2010) (not designated for publication).

were found at the scene of the shooting, the bullet recovered from the deceased's body could not be matched to a particular weapon, as no firearms were ever recovered.

During preparation of the State's case against the appellant, the deceased's sister, Priscilla Palomo, provided the State with information regarding three MySpace profile pages that she believed the appellant was responsible for registering and maintaining.[3] After subpoenaing MySpace.com for the general "Subscriber Report" associated with each profile account, the State printed out images of each profile page directly from the MySpace.com website, and then marked the profile pages and related content as State's exhibits for trial. The State used Palomo as the sponsoring witness for these MySpace accounts at guilt/innocence, and, over the appellant's running objection as to the authenticity of the profile pages, the State was permitted to admit into evidence the names and account information associated with the profiles, photos posted on the profiles, comments and instant messages linked to the accounts, and two music links posted to the profile pages.

The State had Palomo explain how she came across the profiles and brought them to the attention of the prosecutor. The trial judge sustained the appellant's first authentication objection when the prosecutor began asking Palomo questions about the specific content of the MySpace profiles prior to introducing any exhibits into evidence. After a brief sidebar

---

[3] Social networking websites such as MySpace and Facebook "typically allow users to customize their own personal web pages (often known as 'profiles'), post photographs or videos, add music, or write a journal or blog that is published to the online world." John S. Wilson, Comment, *MySpace, Your Space, or Our Space? New Frontiers in Electronic Evidence*, 86 OR. L. REV. 1201, 1220 (2007).

conference at the bench with defense counsel off the record, the prosecutor marked the relevant MySpace profile printouts as numbered State's exhibits and had Palomo identify the printouts as the profiles she had found on MySpace. The prosecutor also offered into evidence the subscriber reports and accompanying affidavits subpoenaed from MySpace.[4] The judge then admitted the printouts of the profiles, over the appellant's objection that the State still had not laid the proper predicate to prove that the profiles were in fact what the State purported them to be, namely, declarations that the appellant himself had posted on his personal MySpace pages.

According to the subscriber reports, two of the MySpace accounts were created by a "Ron Mr. T," and the third by "Smiley Face," which is the appellant's widely-known nickname. The account holder purported to live in "D TOWN," or "dallas," and registered the accounts with a "ronnietiendajr@" or "smileys_shit@" email address. The State introduced multiple photos "tagged" to these accounts because the person who appeared in the pictures at least resembled the appellant. The person is shown displaying gang-affiliated

---

[4] A total of three subscriber reports were admitted into evidence, one for each MySpace account. Each of the three subscriber reports reflects a different "User #" and a different "Sign up IP" number. "A computer connected to the Internet is assigned an IP address, which can uniquely identify that computer at least for the time that it is connected." Andrew M. Grossman, Case Note & Comment, *No, Don't IM Me – Instant Messaging, Authentication, and the Best Evidence Rule*, 13 GEO. MASON L. REV. 1309, 1315-16 (Spring/Summer 2006). Oftentimes, the technology "can be made to yield a user's IP address, and in most cases, that address can be tied to a means of accessing the Internet and thus a person, just as a telephone number can be connected to the person paying for it." *Id*. at 1335. There was no testimony elicited at the appellant's trial, however, and nothing on the face of the one-page subscriber reports themselves, to explicitly indicate whether any of the three User #s are the appellant's or whether any of the three Sign up IP numbers corresponds to a computer either belonging to the appellant or to which he had access.

tattoos and making gang-related gestures with his hands.

The main profile pages of the MySpace accounts contained quotes boasting "You aint BLASTIN You aint Lastin" and "I live to stay fresh!! I kill to stay rich!!" Under the heading "RIP David Valadez" was a link to a song that was played by Valadez's cousin at Valadez's funeral. Another music link posted to one of the profiles was a song titled "I Still Kill." The instant messages exchanged between the account holder and other unidentified MySpace users included specific references to other passengers present during the shooting, circumstances surrounding the shooting, and details about the State's investigation following the shooting. The author of the messages made specific threats to those who had been "snitchin" and "dont run shit but they mouth," assigning blame to others for being the "only reason im on lock down and have this shit on my back." The author also generally boasted to another user that "WUT GOES AROUND COMES AROUND" and "U KNO HOW WE DO, WE DON'T CHASE EM WE REPALCE EM." The author accused: "EVERYONE WUZ BUSTIN AND THEY ONLY TOLD ON ME." Several of the instant messages also complained about the author's electronic monitor, which was a condition of the appellant's house arrest while awaiting trial.[5]

The State elicited additional testimony concerning the MySpace pages through a Dallas Police Department gang unit officer, Detective Daniel Torres, during guilt/innocence

---

[5] All quotes are as they appear in State's Exhibit 94, which contains printouts of messages between one of the MySpace accounts that the State asserted belonged to the appellant and various other unidentified MySpace users.

and through Valadez's mother during punishment. The officer testified regarding the common use of social networking media, such as MySpace, by gangs to stay in touch with members and to "promote" their gangs by bragging about participation in gang-related activities. At punishment, Valadez's mother was permitted to testify about how "devastated" she and her family were when they found the appellant's music link on his profile page with the title "RIP David Valadez," which in her eyes was the appellant's way of bragging about killing her son through the song that was played at his memorial. The appellant repeatedly objected, during both stages of trial, on the basis of improper authentication, hearsay, and relevance.

Through cross examination of Palomo, defense counsel elicited testimony regarding the ease with which a person could create a MySpace page in someone else's name and then send messages, purportedly written by the person reflected in the profile picture, without their approval. Defense counsel emphasized that any case-specific facts that were referenced in the MySpace messages associated with these accounts were not facts solely within the defendant's knowledge, but were known to the deceased's family, friends, and practically any other third party interested in the case. Although the gang officer, Torres, testified to having prior experience using MySpace to investigate gang-related activity, when asked on cross examination whether he had any particular knowledge regarding how a MySpace account is created, he stated: "None, whatsoever." The officer acknowledged that anyone could create a MySpace page, but he had never created one himself.

During the appellant's guilt/innocence closing argument, counsel again emphasized the ease with which a MySpace account could be created or accessed without someone's approval and highlighted the State's failure to prove that the accounts were created by the appellant through any technological or expert evidence, for example, by tracing the IP address listed in the subscriber report to the appellant's personal computer. In sum, defense counsel argued that the MySpace evidence was never authenticated and was not credible evidence that the jury should consider in supporting a guilty verdict. The State's closing arguments during both phases of trial included multiple MySpace references and specific quotes from the profile pages. The jury found the appellant guilty and assessed punishment at thirty-five years in prison.

On appeal, the appellant argued that the trial court erred in overruling his objections to the MySpace evidence. The court of appeals found sufficient "individualization" in the comments and photos on the MySpace pages to satisfy the factors laid out in Texas Rule of Evidence 901(b)(4) and admit the evidence as a "conditional fact of authentication" to support a "finding that the person depicted supplied the information."[6] In so ruling, the court of appeals relied for authority solely upon the opinion of an intermediate appellate court in Maryland that has since been reversed, as the appellant emphasizes now in his brief on the merits before this Court, by that state's highest appellate court.[7] We granted the appellant's

---

[6] *Tienda*, *supra*, at *4-5.

[7] Appellant's Brief, at 5-6. The court of appeals cited the opinion of the Court of Special

petition for discretionary review to determine whether the court of appeals erred in holding that the trial court did not abuse its discretion in finding that the MySpace profiles were properly authenticated. We now affirm.

## THE ARGUMENTS AND THE LAW OF AUTHENTICATION

### The Arguments of the Parties

In his only issue for discretionary review, the appellant contends that the trial court erred in admitting into evidence the electronic content obtained from MySpace during both the guilt/innocence and punishment phases of his trial. The appellant broadly argues that the State failed to properly authenticate any of the evidence printed from the social networking website; and more specifically, that the "contents of a website cannot authenticate the website" itself.[8] In other words, he complains that the State did not prove that he was responsible for creating and maintaining the content of the MySpace pages by merely presenting the photos and quotes from the website that tended to relate to him. Therefore, the appellant concludes, the trial court erred in overruling his running objections under Texas Rules of Evidence Rule 901,[9] and the court of appeals should not have affirmed

Appeals of Maryland, *Griffin v. State*, 192 Md. App. 518, 995 A.2d 791 (2010), while acknowledging that the Maryland Court of Appeals had since granted discretionary review. *Tienda*, *supra*, at *5. The Maryland Court of Appeals subsequently reversed the judgment of the Court of Special Appeals of Maryland, in *Griffin v. State*, 419 Md. 343, 19 A.3d 415 (2011).

[8] Appellant's Brief, at 5.

[9] TEX. R. EVID. 901.

its ruling.

The State contends, in opposition, that the contents of the social networking pages in this case contained sufficiently distinctive information to justify conditionally submitting them to the jury for its ultimate finding whether "the matter in question is what its proponent claims"[10]—here, that the MySpace pages were created and maintained by the appellant. The specificity of the content, which the State characterized as "admissions" by the appellant, was sufficient to tie him to this particular evidence and allow the jury to consider it for that purpose.[11] At a minimum, the State argues, the trial court's decision was "within the zone of reasonable disagreement" and therefore should not be disturbed on appeal.[12]

### Standard of Review and Applicable Law

Under Texas Rules of Evidence Rule 104(a), whether or not to admit evidence at trial is a preliminary question to be decided by the court.[13] A bedrock condition of admissibility of evidence in any legal contest is its relevance to an issue in the case—that is to say, its tendency to make a fact of consequence to determination of the action more or less

---

[10] *Id*. 901(a).

[11] State's Brief, at 1.

[12] *Id*.

[13] TEX. R. EVID. 104(a).

probable.[14] Evidence has no relevance if it is not authentically what its proponent claims it to be. Rule 901(a) of the Rules of Evidence defines authentication as a "condition precedent" to admissibility of evidence that requires the proponent to make a threshold showing that would be "sufficient to support a finding that the matter in question is what its proponent claims."[15] Whether the proponent has crossed this threshold as required by Rule 901 is one of the preliminary questions of admissibility contemplated by Rule 104(a).[16] The trial court should admit proffered evidence "upon, or subject to the introduction of evidence sufficient to support a finding of" authenticity.[17] The ultimate question whether an item of evidence is what its proponent claims then becomes a question for the fact-finder—the jury, in a jury trial.[18] In performing its Rule 104 gate-keeping function, the trial court itself need not be persuaded that the proffered evidence is authentic. The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered

---

[14] TEX. R. EVID. 401 & 402.

[15] TEX. R. EVID. 901(a).

[16] *See* TEX. R. EVID. 104(a), 901(a); *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

[17] TEX. R. EVID. 104(b).

[18] *Druery*, *supra*.

is authentic.[19]

Appellate review of a trial court's ruling on such a preliminary question of admissibility is deferential; the standard is abuse of discretion.[20] If the trial court's ruling that a jury could reasonably find proffered evidence authentic is at least "within the zone of reasonable disagreement," a reviewing court should not interfere.[21]

Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence.[22] Courts and legal commentators have reached a virtual consensus that, although rapidly developing electronic communications technology often presents new and protean issues with respect to the admissibility of electronically generated, transmitted and/or stored information, including information found on social networking web sites, the rules of evidence already in place for determining authenticity are at least generally

---

[19] *Id.*

[20] *Id.*

[21] *Montgomery v.* State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (opinion on reh'g).

[22] *See* TEX. R. EVID. 901(b)(1), (3)-(4) ("**(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule: (1) *Testimony of witness with knowledge.* Testimony that a matter is what it is claimed to be. * * * (3) *Comparison by trier or expert witness.* Comparison by the trier of fact or by expert witness with specimens which have been found by the court to be genuine. (4) *Distinctive characteristics and the like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.").

"adequate to the task."[23]  Widely regarded as the watershed opinion with respect to the admissibility of various forms of electronically stored and/or transmitted information is *Lorraine v. Markel American Insurance Co.*[24]  There the federal magistrate judge observed that "any serious consideration of the requirement to authenticate electronic evidence needs to acknowledge that, given the wide diversity of such evidence, there is no single approach to authentication that will work in all instances."[25]  Rather, as with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the

---

[23]

Steven Goode, *The Admissibility of Electronic Evidence*, 29 REV. LITIG. 1, 7 (Fall 2009); *see* Sandra Hornberger, Comment, *Social Networking Websites: Impact on Litigation and the Legal Profession in Ethics, Discovery, and Evidence*, 27 TOURO L. REV. 279, 304-05 (2011) (opining that "the existing evidentiary rules sufficiently address any legal issues surrounding the admission of information obtained from social networking websites"); Katherine Minotti, Comment, *Evidence: The Advent of Digital Diaries: Implications of Social Networking Web Sites for the Legal Profession*, 60 S.C. L. REV. 1057, 1074 ("the current federal rules are adequate" to guide courts "when facing evidentiary issues regarding social networking web sites"); Grossman, *supra*, at 1311 ("judges may express the appropriate skepticism due instant messaging evidence within the framework of the Rules [of Evidence]."); *In the Interest of F.P., a Minor*, 878 A.2d 91, 95 (Pa. 2005) (rejecting the need to "create a whole new body of law just to deal with [the admissibility of] e-mails or instant messages" and opining that "e-mail messages and similar forms of electronic communication can be properly authenticated within the existing framework" of the rules of evidence); *State v. Eleck*, 130 Conn. App. 632, 640, 23 A.3d 818, 823 (2011) ("We agree that the emergence of social media such as e-mail, text messaging and networking sites like Facebook may not require the creation of new rules of authentication with respect to authorship.").

[24]

241 F.R.D. 534 (D. Md. 2007). *See also* Paul W. Grimm, Michael V. Ziccardi & Alexander W. Major, *Back to the Future: Lorraine v. Markel American Insurance Co. and New Findings on the Admissibility of Electronically Stored Information*, 42 AKRON L. REV. 357 (2009).

[25]

*Lorraine*, *supra*, at 553-54.

particular case.[26]

Like our own courts of appeals here in Texas,[27] jurisdictions across the country have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and its various state analogs. Printouts of emails, internet chat room dialogues, and cellular phone text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity.[28] Such prima facie authentication has

---

[26] *See, e.g.*, *Druery*, *supra*, at 502-03 (authentication of letters); *DeLuna v. State*, 711 S.W.2d 44, 46 (Tex. Crim. App. 1986) (photographs); *Ex parte Watson*, 606 S.W.2d 902, 905 (Tex. Crim. App. 1980) (handwriting comparison).

[27] *See, e.g.*, *Manuel v. State*, ___ S.W.3d ___, No. 12-09-00454-CR, 2011 WL 3837561, at *7 (Tex. App.—Tyler Aug. 31, 2011, no pet.) (text messages); *Shea v. State*, 167 S.W.3d 98, 104-05 (Tex. App.—Waco 2005, pet. ref'd) (emails); *Massimo v. State*, 144 S.W.3d 210, 215-17 (Tex. App.—Fort Worth 2004, no pet.) (emails).

[28] *See Jackson v. State*, 2009 Ark. App. 466, 320 S.W.3d 13 (2009) (Yahoo instant message conversations); *Bobo v. State*, 102 Ark. App. 329, 285 S.W.3d 270 (2008) (emails); *Hammontree v. State*, 283 Ga. App. 736, 642 S.E.2d 412 (2007) (internet instant message conversation); *Simon v. State*, 279 Ga. App. 844, 632 S.E.2d 723 (2006) (emails); *Ford v. State*, 274 Ga. App. 695, 617 S.E.2d 262 (2005) (internet chat room); *State v. Glass*, 146 Idaho 77, 190 P.3d 896 (on-line conversation); *People v. Chromik*, 408 Ill. App.3d 1028, 946 N.E.2d 1039 (2011) (text message); *People v. Downin*, 357 Ill.App.3d 193, 828 N.E.2d 341 (2005) (email); *Commonwealth v. Purdy*, 459 Mass. 442, 945 N.E.2d 372 (2011) (emails); *Commonwealth v. Amaral*, 78 Mass. App. Ct. 671, 941 N.E.2d 1143 (2011) (emails); *Kearley v. State*, 843 So. 2d 66 (Miss. App. 2002) ( emails); *People v. Clevenstine*, 68 A.D.3d 1448, 891 N.Y.S.2d 511 (2009) (MySpace instant messages); *State v. Thompson*, 777 N.W.2d 617 (N.D. 2010) (text messages); *In the Interest of F.P., a Minor*, 878 A.2d 91 (Pa. 2005) (instant messages); *State v. Taylor*, 178 N.C. App. 395, 632 S.E.2d 218 (2006) (text messages); *Bloom v. Commonwealth*, 262 Va. 814, 554 S.E.2d 84 (2001) (instant messages); *United States v. Gagliardi*, 506 F.3d 140 (2nd Cir. 2007) (emails and internet chat room); *United States v. Barlow*, 568 F.3d 215 (5th Cir. 2009) (Yahoo instant message conversations); *United States v. Tank*, 200 F.3d 627 (9th Cir. 2000) (internet chat room); *United States v. Simpson*, 152 F.3d 1241 (10th Cir. 1998) (internet chat room); *United States v. Siddiqui*, 235 F.3d 1318 (11th

taken various forms. In some cases, the purported sender actually admitted to authorship, either in whole or in part,[29] or was seen composing it.[30] In others, the business records of an internet service provider or a cell phone company have shown that the message originated with the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone.[31] Sometimes the communication has contained information that only

---

Cir. 2000) (email).

[29] *Jackson*, *supra*, Ark. App. at 469, S.W.3d at 16 (defendant admitted to police that he had engaged in instant message conversations and acknowledged transcripts as accurate); *Bobo*, *supra* (defendant admitted sending emails, only denying some of the content); *Simon*, *supra*, Ga. App. at 847, S.E.2d at 726 (defendant admitted to two witnesses, including police officer, that he participated in the email exchange); *Ford*, *supra*, Ga. App. at 697, n.7, S.E.2d at 266, n.7 (defendant gave statement to police admitting to engaging in the on-line chat); *Kearley*, *supra*, at 70 (defendant admitted to police that he sent emails); *Thompson*, *supra*, at 621-22 (defendant's husband testified that he received text messages from what he knew to be her phone number and that she signed them in a distinctive manner with which he was familiar, and the defendant admitted sending text messages from her phone to her husband's phone that day); *Bloom*, *supra*, Va. at 821, S.E.2d at 87 (defendant admitted to police officer that he had communicated with instant message recipient on evening in question).

[30] *Massimo*, *supra*, at 213 (defendant was "witnessed" to have sent similarly threatening email to recipient in the past); *Clevenstine*, *supra*, A.D.3d at 1450-51, N.Y.S.2d at 514 ("a legal compliance officer for MySpace explained that the messages on the computer disk had been exchanged by users of accounts created by defendant and the victims, and defendant's wife recalled the sexually explicit conversations she viewed in the defendant's MySpace account while on their computer").

[31] *Bobo*, *supra*, Ark. App. at 335, S.W.3d at 275 (forensic computer expert testified that some of the emails "matched a temporary unique IP internet address for" the defendant's computer); *Hammontree*, *supra*, Ga. App. at 739, S.E.2d at 415 (internet message conversation originated from defendant's son's account, but messages signed by the defendant, he had access to son's computer, and son denied being author); *Chromik*, *supra*, Ill. App. at 1047-48, N.E.2d at 1056-57 (phone records show text messages sent from defendant's phone number at particular date and time alleged,

the purported sender could be expected to know.[32] Sometimes the purported sender has responded to an exchange of electronic communications in such a way as to indicate circumstantially that he was in fact the author of the particular communication, the authentication of which is in issue.[33] And sometimes other circumstances, peculiar to the facts of the particular case, have sufficed to establish at least a prima facie showing of

and defendant admitted sending some of them, acknowledging accuracy of transcripts); *Purdy*, *supra*, Mass. at 450-51, N.E.2d at 381 (emails originated from email account bearing defendant's name and that he admitted was his, were found on computer he acknowledged was his, and contained information about his business that was, if not unique, then at least "unusual").

[32]
*Downin*, *supra*, Ill. App. 3d at 195, N.E.2d at 344-45 (victim knew defendant personally, had exchanged emails with him in the past at an email address she knew to be his, and the email in issue came from his address, was responsive to an email she had sent him, and "contained information that would be known exclusively to" him); *Taylor*, *supra*, N.C. App. at 414, S.E.2d at 230-31 (text messages identified purported sender by name and described car he would be driving on a particular occasion); *Simpson*, *supra*, at 1250 (defendant identified himself by name and email address in the course of internet chat room communications, and search of his home revealed specific written information found next to his computer that had been conveyed to him via those communications); *Siddiqui*, *supra*, at 1322-23 (emails purported to come from defendant's known email address, referred to the author by defendant's nickname, and contained allusions to events and circumstances that only defendant could reasonably be expected to know about).

[33]
*Shea*, *supra*, at 105 (defendant called recipient to confirm that she had received his email); *Glass*, *supra*, Idaho at 82, P.3d at 901 (in on-line conversation, defendant identifies himself by his middle name and then appears at a time and place agreed to, and in a car accurately described, in the conversation); *Amaral*, *supra*, Mass. App. Ct. at 674, N.E.2d at 1147 (defendant included photo and phone number in emails, which proved to be his, and one email "indicated that [he] would be at a certain place at a certain time, and [he] appeared at that place and time"); *Bloom*, *supra* (defendant revealed his true name and certain biographical information that was accurate, and appeared at the time and place where he had agreed to meet recipient); *Gagliardi*, *supra*, at 143 (defendant showed up at meeting place arranged during the course of exchange of electronic messages); *Barlow*, *supra*, at 218 (defendant arranged via Yahoo instant messages to meet at a state park, and appeared at the appointed place and time, admitting to police that he was there to meet the recipient); *Tank*, *supra*, at 630-31 (defendant admitted that screen name used in text messages was his, and witnesses testified that "when they arranged a meeting with the person who used [that screen name], it was Tank who showed up").

authentication.[34]

However, mindful that the provenance of such electronic writings can sometimes be open to question—computers can be hacked, protected passwords can be compromised, and cell phones can be purloined—courts in other cases have held that not even the prima facie demonstration required to submit the issue of authentication to the jury has been satisfied.[35]

---

[34]

*Manuel*, *supra*, at *8 (text messages originated from phone number that the recipient recognized to be the defendant's, from which number she had also received various voice messages from which she recognized the defendant's voice); *In the Interest of F.P., a Minor*, *supra*, at 95 (instant messages purportedly sent by defendant referenced him by name as the sender, and threats made and events discussed therein mirrored animosity that defendant had displaying toward recipient contemporaneously with the period during which messages were sent).

[35]

*See People v. Beckley*, 185 Cal. App. 4th 509, 518, 110 Cal. Rptr. 3d 362, 368-69 (2010) (purported roster of gang members which appeared on a web page printed from the internet was not properly authenticated where sponsoring police officer did not know who compiled it and did not explain the basis for his assertion that the gang itself did so); *Eleck*, *supra*, Conn. App. at 642-43, A.3d at 824 (printout of instant message exchange from defendant's Facebook page not properly authenticated just because the messages appeared to come from the purported sender's Facebook account; the messages fail to "reflect distinct information that only [the sender] would have possessed regarding the defendant or the character of their relationship"); *Hollie v. State*, 298 Ga. App. 1, 3, 679 S.E.2d 47, 50 (2009) (though email showed on its face that it originated from purported sender's email address, "this alone does not prove its genuineness"); *Commonwealth v. Williams*, 456 Mass. 857, 869, 926 N.E.2d 1162, 1172-73 (2010) (message not properly authenticated, even though it came from purported sender's MySpace page, because "there is no testimony (from [the recipient] or another) regarding how secure such a Web page is, who can access a MySpace Web page, whether codes are needed for such access, etc.[,]" and also no testimony circumstantially to "identify the person who actually sent the communication"); *People v. Lenihan*, 30 Misc. 3d 289, 293, 911 N.Y.S.2d 588, 591-92 (2010) ("defendant could not authenticate" photographs taken from a MySpace website because he "did not know who took [them] or posted them on MySpace"); *Commonwealth v. Koch*, ___ A.3d ___, 2011 WL 4336634, at *6 (Pa. Super. Ct. 2011) (cell phone text messages require more for authentication "than mere confirmation that the number or address belonged to" the purported sender and were inadmissible in the absence of "contextual clues in the . . . messages themselves tending to reveal the identity of the sender"); *United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (posting on white supremacist group's internet web site not authenticated because no showing that the group actually posted it as opposed to the defendant "herself, who was a skilled computer user"); *St. Clair v. Johnny's Oyster & Shrimp,*

That an email on its face purports to come from a certain person's email address, that the respondent in an internet chat room dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author—none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity.[36]

## ANALYSIS

In this case, the internal content of the MySpace postings—photographs, comments, and music—was sufficient circumstantial evidence to establish a prima facie case such that a reasonable juror could have found that they were created and maintained by the appellant. That circumstantial evidence included:

- The first MySpace business record I.D. is #120841341. The official MySpace Subscriber Report lists the User as "First Name: ron; Last Name: mr.t" with an email address of "smileys_shit@." [Witnesses testified that the appellant's nick-name is "Smiley."] The city is listed as "D TOWN."

- The Subscriber Report for MySpace User #300574151 lists the

_____

*Inc.*, 76 F. Supp. 2d 773, 774-75 (S.D. Texas 1999) (random posting on internet web site cannot be authenticated because untrustworthy, given that "[a]nyone can put anything on the Internet").

[36]

*See* Goode, *supra*, at 10 ("the mere fact that an e-mail bears a particular e-mail address will often prove inadequate to authenticate the identity of the author; typically courts demand at least a little more evidence"); *Purdy*, *supra*, Mass. at 451, N.E.2d at 381 ("Evidence that the defendant's name is written as the author of an e-mail or that the electronic communication originates from an e-mail or social networking Web site such as Facebook or MySpace that bears the defendant's name is not sufficient alone to authenticate the electronic communication as having been authored or sent by the defendant."); *Koch*, *supra*, at *6 ("In the majority of courts to have considered the question, the mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, court demand additional evidence.").

owner as "First Name: ron; Last name: Mr. T" with an email address of "ronnietiendajr@." As with the first MySpace listing, the city for this listing is "D*Town." The zip code is 75212.

- The Subscriber Report for MySpace User #435499766 lists the owner as "First Name: SMILEY; Last Name: FACE" with an email address of ronnietiendajr@. The city for this listing is "dallas" and the zip code is 75212.

- The first MySpace page of User #120841341 offered into evidence contains a photograph of the appellant[37] under the title "SMILEY FACE." The photograph shows the appellant pulling a shirt up over the bottom half of his face. The tattoos on his arms, however, are clearly visible. There is a date stamp on the photograph of "03/01/2007 17:09."[38]

- To the right side of the appellant's photograph on that MySpace page is the following:

     "You aint BLASTIN

---

[37] Priscilla Palomo, the witness who sponsored the exhibits, identified the MySpace photographs as being of the appellant. Detective Daniel Torres also identified them as being of the appellant. The trial judge could also compare the photographs of the person on the MySpace pages (during trial they were downloaded from a CD and were in color and enlarged for clarity; that CD is in the appellate record) with the appellant sitting at the defense table. Suffice it to say that the person in the MySpace photographs has distinctive features and very distinctive tattoos on his body, neck, and arms. In many of the photographs, he is wearing the same distinctive glasses and a square earring. Although some of the xeroxed copies of the photographs in the reporter's record are fuzzy and unclear, the ones on the CD are not. One witness, who was at the club with the appellant on the night of the murder, testified that the appellant has the number "18" tattooed on the back of his head. One of the witnesses in the car with David Valadez, recognized the appellant as the shooter because he had the number "18" tattooed on his head. One of the MySpace photos shows the appellant with the number "18" tattooed on his head. Furthermore, one of the State's witnesses had already identified a photograph of the appellant and his friend "Nu-Nu" taken on the night of David Valadez's murder. The appellant's appearance in that photograph matches his appearance in the MySpace photographs.

[38] David Valadez was murdered on June 25, 2007, about four months later.

You aint Lastin"

Male
21 years old
D Town, Texas
United States

Last Login: 9/4/2007[39]

- Below the appellant's photograph and the caption on that MySpace page is the legend "RIP David Valadez" and a music button which, according to Priscilla Paloma, played the song that was played at David Valadez's funeral.

- On the MySpace page for User #300574151, there is a photograph of the appellant, bare-chested, with his gang tattoos—including "Tango Blast" written across his chest.[40]

- The MySpace page is titled "MR. SMILEY FACE" even though the Subscriber Report list the User's name as "ron Mr. T" and his email address as "ronnietiendajr@."

- Beside the appellant's photograph on that MySpace page is the following:

> "I LOVE DRAMA SO
> MUCH CUZ MY LIFE
> IS SO ROUGH!!!
> ANYTHING ELSE
> WOULDN'T SEEM
> NORMAL!!!

---

[39] The appellant was 21 on this date. David Valadez was murdered a little more than two months earlier.

[40] This photograph is an apparent self-portrait taken with a smart phone in a mirror. Detective Torres testified that "Tango Blast" and "NS" referred to a local street gang and that a person with these tattoos would be a member of the gang.

Male
22 years old
D*Town, Texas
United States

Last Login: 5/19/2008[41]

- Below the appellant's photograph and the caption on that MySpace page is the music button for the "50 Cent I Still Kill by dj Bali" sound clip.

- Below that caption is the following:

      MR. SMILEY FACE'S INTERESTS
      General       AINT PROUD OF MY PAST BUT
                    IM LIVIN N DA PRESENT N
                    ALWAYS PLANIN 4 DA FUTURE!!!
                    NS XV111 ST[42]

- Also on the MySpace Profile page for User #300574151 is a later photograph of a bare-chested appellant, again showing his tattoo "Tango Blast."[43]

- That photograph carries the heading: Mr. ONE OF A KIND.

- Beside the appellant's photograph on that MySpace page is the following:

---

[41]

The appellant was 22 years old as of this date.

[42]

XVIII is the Roman numeral for 18. Detective Torres testified that the term "NS XV111 ST" means the North Side 18th Street, which is a particular "North Side gang located in the Grand Prairie are of the metroplex." The number 18 on the MySpace Page matches the number 18 tattooed on the back of the appellant's head.

[43]

This is another apparent self-portrait of the appellant taken with a smart phone in a mirror, showing his "Tango Blast" chest tattoo, as well as the tattoos on his arms, posted on the MySpace page for User #435499766, registered to "SMILEY FACE" with an email address of "ronnietiendajr@."

> "DIS IS WHO I AM!!!
> DON'T LIKE IT FUCK
> YOU!!!"
>
> Male
> 22 years old
> D*Town, Texas
> United States
>
> Last Login: 9/5/2008[44]

- On the right hand side of the page is the following statement: Mr.ONE OF A KIND I LIVE TO STAY FRESH!! I KILL TO STAY RICH!! N OTHER WORDS IMA GO TO WAR BOUT MY SHIT!!

- The MySpace User #300574151 message page contains numerous messages to other MySpace users.[45] Only the 53 messages sent between 2:00 p.m. and 9:44 p.m. on September 21, 2008, were introduced into evidence. The messages that indicate that it is the appellant himself who is the creator, owner, and user of this MySpace account include the following:

- At 2:09 p.m. the User sent a message to User #73576314: "SHIT CAN U BELIEVE I ALREADY BEEN ON DIS MONITOR A YEAR NOW AND SHIT AINT NO TELLING WHEN A NIGGA GONE GET OFF DIS HOE"[46]

---

[44] The appellant was 22 years old as of this date.

[45] Torres, the Dallas gang officer, testified that gang members frequently communicate with each other through electronic social media, including MySpace.

[46] According to the Clerk's Record, the appellant was released on pretrial bond with an ankle monitor on October 24, 2007. One of the photographs on the MySpace page for User #435499766 (registered to "SMILEY FACE" with an email address of "ronnietiendajr@") is of the appellant lounging in a chair with a gold chain hanging down his chest, wearing bright white sneakers and an ankle monitor. Another MySpace photograph, associated with User #120841341, shows the

- At 2:17 p.m. the User sent a message to the same User: "SHIT IT AINT ME IT THE STATE SETTIN IT OFF AND SINCE I HAVE SNITCHES ON ME THEY TRYNA GET A NIGGA LOCKED UP"

- Also at 2:17 p.m., the User sent a message to User #103410565: "U KNO ME AND U MY NIGGA SO U WANT TO FUCK HIM UP U KNO HOW WE DO, WE DONT CHASE EM WE REPALCE EM"

- At 2:21 p.m. the User sent another message to User #103410565: "IS IT DAT FRIENDLY ASS NIGGA IN ALL DEM PIX AND SHIT JUS PLAY IT COO WUT GOES AROUND COMES AROUND YA FEEL ME"

- At 2:22 p.m. the User sent a message to User #73576314: "MAN JESSE BOY HECTOR SNITCHIN ON ME I AINT TRIPPIN ON BEEF BUT TELLIN A WHOLE NOTHER BALL GAME DAT I DONT PLAY"

- At 2:27 p.m. the User sent a message to User #12231226: "SHIT ON STILL ON A MONITOR SO I AINT BEEN NO WHERE IN A BOUT A YEAR NOW AND MY B DAY WAS O THA12TH U FO GOT BOUT ME"[47]

- At 2:35 p.m. the User sent a message to User #73576314: "YEA Y U THINK IM ON DIS MONITOR MY NIGGA SHIT HATIN ASS NIGGAS WNNA TALK ALL DAT GANGSTA SHIT AND WEN THE GOIN GET TUFF DEM NIGGAS DON'T RUN SHIT BUT THEY MOUTH"

- At 2:42 p.m. the User sent a message to the same User: "YEA

---

appellant and two friends "throwing gang signs" in front of what appears to be a club with the caption, "str8 outta jail and n da club."

[47] A pen packet introduced at the punishment phase of trial confirms that the appellant's date of birth is September 12th.

SHIT EVERYONE WUZ BUSTIN AND THEY ONLY TOLD ON ME"

- At 2:50 p.m. the User sent another message to the same User: "YEA SHIT U KNO I KEEP GANGST EVEN AFTER HECTOR SHOT AT NEW AT RUMORS WE STILL DIDNT TELL AND I KNO JESSE TOLD HIM WE WAS THERE CUZ WE SAW THEM AT THA CLUB BUT ITS COO IF I GET OFF MAN@!!!!!"[48]

This combination of facts—(1) the numerous photographs of the appellant with his unique arm, body, and neck tattoos, as well as his distinctive eyeglasses and earring; (2) the reference to David Valadez's death and the music from his funeral; (3) the references to the appellant's "Tango Blast" gang; and (4) the messages referring to (a) a shooting at "Rumors" with "Nu-Nu,"(b) Hector as a "snitch,"[49]and (c) the user having been on a monitor for a year (coupled with the photograph of the appellant lounging in a chair displaying an ankle monitor) sent from the MySpace pages of "ron Mr. T" or "MR. SMILEY FACE" whose email address is "ronnietiendajr@"—is sufficient to support a finding by a rational jury that the MySpace pages that the State offered into evidence were created by the appellant. This is ample circumstantial evidence—taken as a whole with all of the individual, particular details considered in combination—to support a finding that the MySpace pages belonged to the appellant and that he created and maintained them.

---

[48] The prosecutor translated this message as: "Yeah, shit, you know I keep it gangster, even after Hector shot at Nu-Nu at Rumors, we still didn't tell. And I know Jesse told him we was there, 'cause we saw them at the club, but it's cool if I get off, man."

[49] A witness by the name of Hector Gonzalez did indeed testify against the appellant at trial.

It is, of course, within the realm of possibility that the appellant was the victim of some elaborate and ongoing conspiracy. Conceivably some unknown malefactors somehow stole the appellant's numerous self-portrait photographs, concocted boastful messages about David Valadez's murder and the circumstances of that shooting, was aware of the music played at Valadez's funeral, knew when the appellant was released on pretrial bond with electronic monitoring and referred to that year-long event along with stealing the photograph of the grinning appellant lounging in his chair while wearing his ankle monitor. But that is an alternate scenario whose likelihood and weight the jury was entitled to assess once the State had produced a prima facie showing that it was the appellant, not some unidentified conspirators or fraud artists, who created and maintained these MySpace pages.

The court of appeals in this case relied upon the opinion of an intermediate court of appeals in Maryland in a case presenting similar facts.[50] But that intermediate appellate court's opinion has since been reversed on discretionary review.[51] In *Griffin v. State*,[52] involving a prosecution for murder and assault, the State proffered a printout of portions of a MySpace profile purporting to be that of Griffin's girlfriend.[53] Although the girlfriend

---

[50] *Tienda*, *supra*, at *5 (citing *Griffin v. State*, 192 Md. App. 518, 995 A.2d 791 (2010)).

[51] *Griffin v. State*, 419 Md. 343, 19 A.3d 415 (2011).

[52] 419 Md. 343, 19 A.3d 415 (2011).

[53] *Id.*, Md. at 348, A.3d at 418.

testified at trial, the State did not attempt to authenticate the MySpace profile as genuinely hers through her testimony.[54] Instead, the lead investigator in the case testified that the MySpace profile identified itself as being that of "Sistasouljah," having the same date of birth as the girlfriend.[55] Also posted on the profile was a photographic image of the defendant with his girlfriend.[56] The State argued that the date of birth and the photograph provided sufficient indicia of authentication to justify admission of other postings on the MySpace profile that amounted to veiled threats against the State's principal witness against the defendant.[57] The Maryland Court of Appeals disagreed.[58] "Anyone can create a MySpace profile at no cost," the Court observed, and "anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password[.]"[59] Relying for "assistance" in its analysis upon *Lorraine*, the Maryland Court of Appeals concluded:

> The potential for abuse and manipulation of a social networking site by someone other than its purported creator and/or user leads to our conclusion

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*, Md. at 357, A.3d at 423.

[59] *Id.*, Md. at 351 & 352, A.3d at 420 & 421.

that a printout of an image from such a site requires a greater degree of authentication than merely identifying the date of birth of the creator and her visage in a photograph on the site in order to reflect that [the defendant's girlfriend] was its creator and the author of [the threatening language posted thereon].[60]

Accordingly, the Maryland Court of Appeals held that the trial court had abused its discretion to find that the State had laid an adequate prima facie foundation for admission of the MySpace profile postings.[61]

Along the way, the Maryland Court of Appeals recognized that such postings may readily be authenticated, explicitly identifying three non-exclusive methods.[62] First, the proponent could present the testimony of a witness with knowledge; or, in other words, "ask the purported creator if she indeed created the profile and also if she added the posting in question."[63] That may not be possible where, as here, the State offers the evidence to be authenticated and the purported author is the defendant. Second, the proponent could offer the results of an examination of the internet history or hard drive of the person who is claimed to have created the profile in question to determine whether that person's personal

---

[60] *Id.*, Md. at 357-58, A.3d at 424.

[61] *Id.*, Md. at 357, A.3d at 423.

[62] *Id.*, Md. at 363-65, A.3d at 427-28.

[63] *Id.* Md. at 363, A.3d at 427.

computer was used to originate the evidence at issue.[64]  Or, third, the proponent could

produce information that would link the profile to the alleged person from the appropriate

employee of the social networking website corporation.[65]  The State of Maryland failed to

take advantage of any of these methods in *Griffin*.  And it is true that the State of Texas has

likewise failed to utilize any of them in the appellant's case.[66]  Nevertheless, as we have

explained, there are far more circumstantial indicia of authenticity in this case than in

*Griffin*—enough, we think, to support a prima facie case that would justify admitting the

evidence and submitting the ultimate question of authenticity to the jury.  We hold that the

court of appeals did not err to conclude that it was within the trial court's discretion to admit

the MySpace postings, notwithstanding that the persuasive authority it relied upon for that

proposition has since been overruled.

**CONCLUSION**

Because there was sufficient circumstantial evidence to support a finding that the

exhibits were what they purported to be—MySpace pages the contents of which the appellant

was responsible for—we affirm the trial judge and the court of appeals which had both

concluded the same.

---

[64]

*Id.*

[65]

*Id.*, Md. at 364, A.3d at 428.

[66]

The State never clearly laid out for the jury how a MySpace account is created and maintained, never defined the terms unique to MySpace technology, and never explained how an account holder accesses and uses his account in the regular course of MySpace activity.

DELIVERED:      February 8, 2012
PUBLISH