**Opinion issued October 10, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00269-CR

————————————

## JAMES LEON LAURENTZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1305796**

---

## MEMORANDUM OPINION

James Leon Laurentz was convicted by a jury of indecency with a child

involving sexual contact.[1]  The same jury assessed his punishment at eight years'

---

[1]     TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011).

confinement but recommended that the trial court place him on community supervision. Following the jury's recommendation, the trial court suspended the imposition of the sentence as to confinement and placed Laurentz on community supervision for ten years.[2] In his single appellate issue, Laurentz contends that the trial court abused its discretion in admitting a chain of Facebook messages allegedly exchanged between him and the complainant (State's exhibit 1) without sufficient authentication. We affirm.

## Background

On December 31, 2010, N.B.[3] spent the night at her friend, Kaylah Laurentz's, house, as she had done many times before. After playing video games and spending time with friends, N.B. testified that she went to sleep in Kaylah's bed. Later that evening, Laurentz, Kaylah's father, came into the bedroom to speak to Kaylah and then gave the two girls foot massages. Laurentz left the bedroom, but after Kaylah fell asleep, he returned. This time, Laurentz began by rubbing N.B.'s feet but he did not stop there. According to N.B., after he massaged her feet, Laurentz moved his hands up her body, going underneath her shirt, and "tickling on [her] belly" until he reached the bottom of her bra. N.B.

---

[2] Further terms of his community supervision included Laurentz's 120 days in the Harris County jail, sex-offender treatment, 150 hours of community service, and no contact with children.

[3] In order to protect her identity, the complainant, who was fifteen-years old when the assault took place, will be referred to by her initials (N.B.).

testified that Laurentz then started massaging her legs again and finally rubbing her vagina through her clothing.  Laurentz left and returned to the room multiple times that night, and each time he would roll N.B. onto her back against her will, and begin the ordeal again.  According to N.B., Laurentz did not stop touching her until Kaylah's mother came to the bedroom door twice that night and inquired as to what Laurentz was doing in there.

Laurentz and Kaylah drove N.B. home early the next morning, January 1, 2011.  N.B. testified that she was scared of being alone with Laurentz and insisted that Kaylah accompany them.  At 6:29 a.m., the same morning, "James Laurentz" sent a Facebook message to N.B.'s Facebook account asking for her forgiveness and promising to never put her in that situation again.  Specifically, "James Laurentz" wrote:

> I sinned against you and am sorry.  I as[k] your forgiveness even though I do not deserve it.  I can't take it back but I can assure you that I will never put you in that situation again.  I should have been a better example of a Christian man than I was.  Please forgive me.

At 10:04 p.m. that evening, N.B. responded to the message, stating:

> I was terrified, I woke up the next morning and thought I dreamt it all; I was so confused.  It[']s to[o] soon for me to forgive you, hopefully I will in time, but I will never look at you the same.  I can barely even type this message.  It's repulsive.

3

At 7:38 a.m. the next morning "James Laurentz" replied to N.B.'s response, expressing remorse for his actions, apologizing for his "moment of weakness," and asking N.B. not to hold what happened between them against his daughter, Kaylah.

> Please don't hate Kaylah because of me. And remember we all have weak moments in our lives. I have had many. My only saving grace comes from God. I will regret what I did but don't stop trusting in Jesus because of me. My moment of weakness has happened and I would be destroyed if I damaged your faith. I regret the grief I caused you and God. Again I am sorry.[4]

On January 5, 2011, N.B. confided in her friend, Destiny Lily, about the assault and showed Lily some Facebook messages on her cell phone. According to Lily, N.B. logged onto her Facebook account and accessed the messages in her Facebook inbox. Lily testified that when a message is sent via Facebook's messaging feature, which is similar to e-mail, the recipient can tell who the message is from because "it would have [the sender's] name and a picture of [the sender]."

At Lily's urging, N.B. told Lily's aunt, Sandy Edwards, what happened and reluctantly showed her the Facebook messages on her cell phone. Edwards immediately contacted both Laurentz's wife and N.B.'s grandfather. When Mrs.

---

[4] After State's exhibit 1 was admitted into evidence, N.B. testified that she had a Facebook account and that she received a Facebook message from Laurentz after the assault. Although she was "shocked and scared" by the message, N.B. subsequently responded to the message and Laurentz replied to her response. N.B. identified State's exhibit 1 as a copy of the Facebook messages she and Laurentz exchanged.

4

Laurentz and Kaylah arrived at Edwards' home that evening, Edwards informed them about N.B.'s allegations and showed Mrs. Laurentz the messages.[5] N.B.'s grandfather, who arrived at Edwards' home after Kaylah and Mrs. Laurentz had left, was also shown the messages and testified that he viewed them again when he took N.B. to the police station and Detective Jason Meredith (Deer Park Police Department) instructed N.B. to log into her Facebook account and show him the Facebook messages that she and Laurentz had exchanged after the assault. He portrayed the messages on a computer screen and printed a copy of the messages. Detective Meredith identified State's exhibit 1 as a screen shot of the Facebook messages exchanged by Laurentz and N.B. that he printed at the police station. According to the Detective, the URL printed on State's exhibit 1, as well as the contents of the exhibit, identified it as N.B.'s Facebook account.[6] At this time,

---

[5] After State's exhibit 1 was admitted, Mrs. Laurentz testified for the defense that her husband had told her that he had sent N.B. a Facebook message and apologized to N.B. because he had yelled at her the morning after she spent the night at their home. Although it is not expressly identified as such, it is apparent from her testimony that Mrs. Laurentz is referring to the Facebook messages contained in the State's exhibit 1. Kaylah Laurentz, another defense witness, also testified that her father had a Facebook account, he was Facebook "friends" with a lot of her friends, he frequently communicated with her friends via Facebook, and that it was common for her father to send private messages to her friends via Facebook. We note, however, that this defensive testimony does not necessarily render any error associated with the allegedly improper admission of State's exhibit 1 harmless. *See generally Leday v. State*, 983 S.W.2d 713, 719 (Tex. Crim. App. 1998) (stating harmful effect of improperly admitted evidence not cured by fact that defendant sought to meet, destroy, or explain it by introducing rebutting evidence).

[6] Detective Meredith testified that each Facebook profile has a unique URL number.

5

however, the State did not attempt to admit the exhibit into evidence or elicit any testimony from the Detective as to the specific contents of the messages.

During cross-examination, Laurentz's counsel questioned Detective Meredith regarding the vagueness of the Facebook messages. Detective Meredith disagreed with defense counsel's characterization of the messages as "vague," lacking detail, and failing to reference a specific incident. Arguing that the defense had "opened the door" with respect to the actual content of the messages and that the record would be incomplete without the information, the State then moved to have the Facebook messages admitted as State's exhibit 1. Laurentz objected to the admission of State's exhibit 1 on the basis that "no one from Facebook is here to testify as to how Facebook messaging works. These Facebook messages were never accompanied with a business record affidavit stating that they're kept in the normal course of business in Facebook. And there has been no witness that can authenticate that it was Mr. Laurentz who, indeed, sent the messages." The trial court overruled the objection and admitted State's exhibit 1 into evidence.

## Discussion

### A. Standard of Review

We review a trial court's decision as to whether evidence is properly authenticated for an abuse of discretion. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). A trial court does not abuse its discretion when it

6

reasonably believes that a reasonable juror could find that the evidence has been authenticated. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007). If the trial court's ruling is at least "within the zone of reasonable disagreement," we will not interfere. *Id.*

**B.    Applicable Law**

Under Rule of Evidence 104(a), whether or not to admit evidence at trial is a preliminary question to be decided by the court. TEX. R. EVID. 104(a); *Tienda*, 358 S.W.3d at 638. A bedrock condition of admissibility of evidence is its relevance to an issue in the case—that is to say, its tendency to make a fact of consequence more or less probable. TEX. R. EVID. 401, 402; *Tienda*, 358 S.W.3d at 638. The issue of authentication (i.e., that the proffered evidence is what the evidence's proponent claims it to be) arises when "the relevancy of any evidence depends upon its identity, source, or connection with a particular person, place, thing, or event." *Shea v. State*, 167 S.W.3d 98, 104 (Tex. App.—Waco 2005, pet. ref'd). Evidence has no relevance if it is not authentically what the proponent claims it to be. *Tienda*, 358 S.W.3d at 638.

The proponent of the evidence need not rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. *See Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2012, pet. ref'd). In fact, in performing its gate-keeping function under Rule 104, the

7

trial court need not be persuaded that the proffered evidence is authentic. *Tienda*, 358 S.W.3d at 638. Rather, the ultimate question under Rule 104 for the trial court is simply whether the proponent of the proffered evidence has supplied sufficient facts from which a fact-finder could reasonably determine that the evidence is authentic. *Id*.; *see also Manuel*, 357 S.W.3d at 74 ("The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness.").

Authentication is a condition precedent to the admissibility of evidence and the requirement is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims it is. TEX. R. EVID. 901(a). Whether the proponent of the evidence has satisfied the threshold requirement of authenticity is one of the preliminary questions to be decided by the court. *See* TEX. R. EVID. 104(a), 901(a); *Tienda*, 358 S.W.3d at 638.

Rule 901 provides a non-exclusive list of methods for the authentication of evidence, including witness testimony, appearance, contents, substance, or other distinctive characteristics taken in conjunction with circumstances. TEX. R. EVID. 901(b); *see generally Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.) (stating Rule 901 creates low hurdle for admissibility which can be easily cleared by circumstantial evidence).

## C.    Analysis

Both Laurentz and the State argue that the present case is analogous to the Austin Court of Appeals' opinion in *Campbell*, 382 S.W.3d at 549, in which the appellate court upheld the trial court's admission of Facebook messages sent by the defendant to the complainant a few days after an assault.  Although the defendant denied having sent the messages and argued that the complainant had logged into his account and sent the messages to herself, the court concluded that the messages were sufficiently authenticated based upon several factors, including that: (1) the messages were sent to the complainant's Facebook account from a Facebook account bearing the defendant's name; (2) the messages contained internal characteristics that tended to connect the defendant as the author (i.e., a distinctive speech pattern); (3) undisputed testimony that connected the defendant to the messages (e.g., the defendant had a Facebook account, only he and the complainant ever had access to his account, the complainant denied having access to the account when the messages were sent, and the complainant recognized the messages as having been sent by the defendant); and (4) the messages, which were sent within days of the assault, specifically referenced the assault (i.e., the defendant apologized for putting his hands on the complainant).  *See Campbell*, 382 S.W.3d at 551–53.

In the instant case, State's exhibit 1 was properly authenticated through witness testimony and circumstantial evidence, including the contents and characteristics of the Facebook messages themselves. A review of the circumstantial evidence indicating that State's exhibit 1 is what the State claims it to be (i.e., an exchange of communications between Laurentz and N.B.) includes the following: (1) the first and third messages in the chain contain a banner identifying the sender as "James Laurentz"; (2) the first and third messages in the chain also contain a date and time stamp indicating that "James Laurentz" sent those messages within roughly a day of the assault (i.e., 6:29 a.m. on January 1, 2011, and 7:38 a.m. on January 2, 2011, respectively); (3) "James Laurentz" repeatedly expresses remorse for his actions, apologizes for his "moment of weakness," and asks N.B. not to hold what happened between them against Kaylah, Laurentz's daughter; (4) Detective Meredith testified that the URL listed on State's exhibit 1 identified the exhibit as having been printed from N.B.'s Facebook account; (5) both Lily and Detective Meredith testified that N.B. logged into her password-protected Facebook account in order to access the messages; (6) N.B. showed Facebook messages on her cell phone to Lily and Edwards when she confided in them about the assault; (6) N.B.'s grandfather's testified that he viewed Facebook messages between N.B. and Laurentz first on N.B.'s cell phone, and then later on a computer at the police station, and finally, he viewed a printout of the

10

message chain; (7) Detective Meredith testified that he directed N.B. to log onto her Facebook account when she and her grandfather came to the police station; (8) Detective Meredith printed out a screenshot of the Facebook messages that N.B. showed him on the computer at the police station; (9) Detective Meredith identified State's exhibit 1 as the screenshot of the Facebook messages that he printed out between Laurentz and N.B.; and (10) although the messages do not explicitly reference the assault, "James Laurentz" apologizes for having "sinned against" N.B. and he characterizes his "moment of weakness" as something serious enough to be capable of damaging N.B.'s faith in God.

Laurentz argues that the State failed to properly authenticate State's exhibit 1 because (1) unlike in *Campbell*, the Facebook messages did not specifically mention an actual assault and, (2) the State failed to exclude the possibility that the messages were sent by someone other than Laurentz. The fact that the Facebook messages in *Campbell* specifically referenced the underlying offense is merely one factor that the court considered. The fact that the messages in the present case do not explicitly reference the assault does not mean that the State failed to proffer sufficient evidence from which a reasonable jury could conclude that the messages were sent by Laurentz—rather, it is merely one factor for the jury to consider when determining the weight and credibility of the evidence. Similarly, the proponent of the evidence does not need to rule out all possibilities inconsistent with

11

authenticity or prove that the evidence is what it purports to be beyond a reasonable doubt. *Campbell*, 382 S.W.3d at 549. As the Court of Criminal Appeals stated in *Tienda*, even though it may be possible that someone else sent an electronic communication, ultimately it is up to the fact-finder to weigh the evidence and decide whether the communication was sent by the defendant or another person. *Tienda*, 358 S.W.3d at 646.

Laurentz's argument that the State's failure to subpoena a Facebook employee to verify that the messages were sent from Laurentz's Facebook account or admit evidence directly linking Laurentz's computer to the Facebook messages is equally unpersuasive because the State is not required to do either of these things in order to authenticate a non-traditional communication under Rule 901. Here, the State was able to authenticate the exhibit through other accepted manners of authentication under the rule, including the contents and characteristics of the messages and witness testimony.

Laurentz further argues that State exhibit 1's content raises questions as to the document's authenticity because N.B.'s name is misspelled on the exhibit. As previously discussed, the State elicited testimony identifying the Facebook account as N.B.'s, including testimony from Lily and Detective Meredith. The fact that N.B.'s name is misspelled is merely one factor for the jury to consider when evaluating the weight and credibility of the witness testimony linking the

12

correspondence to N.B. It was up to the jury to consider the exhibit itself, as well as the witness testimony, and determine whether the account was actually N.B.'s.

In light of the witness testimony and circumstantial evidence in this case, including the contents and characteristics of the Facebook messages themselves, we conclude that the State proffered sufficient evidence pursuant to Rule 901 from which the jury could have reasonably determined that State's exhibit 1 is what the State claimed it to be—an exchange of Facebook messages between Laurentz and N.B. Accordingly, we hold that the trial court did not abuse its discretion in admitting State's exhibit 1 into evidence. We overrule Laurentz's sole issue.

**Conclusion**

We affirm the trial court's judgment.


Jim Sharp
Justice


Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).

13