**Opinion filed February 14, 2019**



In The

# Eleventh Court of Appeals

_____

## No. 11-17-00060-CR
_____

## JASON PRESTON GROSS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR23658**

## M E M O R A N D U M   O P I N I O N

After a bench trial, the trial court found Jason Preston Gross guilty of assault family violence by occlusion. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B) (West Supp. 2018). After it found "true" as to a prior felony enhancement allegation, the trial court assessed Appellant's punishment at confinement for fifteen years. We affirm.

Appellant brings two issues on appeal. In his first issue on appeal, Appellant contends that the trial court erred when it admitted inadmissible hearsay statements of the alleged victim, Katrina June Valdez. In his second issue on appeal, Appellant claims that his trial counsel provided ineffective assistance when counsel did not object when the State called Valdez as a witness for the sole purpose of impeaching her.

Investigator John Fincher[1] with the Brown County Sheriff's Department testified that, on January 14, 2014, at around 5:30 p.m., he went to the Brown County Law Enforcement Center to respond to a "walk-in for an assault report" from Valdez.

Investigator Fincher testified that, when he saw Valdez, she had various injuries on her body. He observed redness, scratches on her neck and breast, and bruising on her neck, arms, and head. Although there are no written statements in this case, Investigator Fincher made notes of his interview with Valdez. Valdez told Investigator Fincher that she felt like her back was bruised; her ankle was also swollen. Valdez was upset and crying; she was "very very shaken visibly." Valdez's hands were shaking, and her voice indicated that she was upset and scared.

Valdez told Investigator Fincher that she and Appellant were in a dating relationship and that they had been living together. On the night of January 13, 2014, she and Appellant got into an argument. Appellant had been drinking. Valdez did not say that she had been drinking. During the argument, Appellant threw a bottle of conditioner at her and hit her on the side of her face and her neck. Valdez went into the bathroom, and Appellant shut the door. Valdez could not leave the bathroom because the door was broken. Appellant opened the door, laughed at Valdez, knocked Valdez down, kicked her, took her pants off, and told her that she "needed

---

[1]At the time of the offense, Investigator Fincher was a sergeant over patrol for the Brown County Sheriff's Department; at the time of trial, he was an investigator for the department. In this opinion, we will refer to him at the rank he held at the time of trial.

to feel like the whore she is." Appellant then dragged Valdez by the feet, kicked her on her legs and hips, and dragged her by the hair down a hallway.

Valdez also told Investigator Fincher that, at some point during the assault, and while Valdez was on the ground, Appellant put his forearm across her neck and restricted her airway; she could not breathe. Appellant also held a knife to her throat and dragged it across her throat and chest.

Investigator Fincher testified that Valdez told him that the assault stopped when she left the house; she spent the rest of the night at a roadside park. Valdez returned to the house at 6:00 a.m. Valdez said that, when she returned home, Appellant was crying and apologetic and said that he was sorry for what he had done to her.

Appellant left the house. While he was gone, Appellant contacted Valdez and told her that he was going to get some supplies to treat the injuries that he had caused. Instead, when Appellant returned, he had been drinking and became angry again. He threw a box of miscellaneous items at Valdez, and she fell. When Valdez fell, Appellant got on top of her and put his forearm across her throat; she could not breathe. Valdez told Investigator Fincher that "she felt dizzy, and her face felt like it was getting bigger and bigger and was going to pop." When Valdez tried to get up, Appellant flipped her over, grabbed her left arm, and twisted it behind her back. During this time, Appellant was yelling at Valdez and told her to apologize to him; she did.

About ten minutes later, Valdez was able to call her daughter, Courtney Bamber. When Appellant saw that Valdez was talking to Courtney, he told Valdez to tell Courtney that she was lying about what had happened. Appellant told Valdez to tell Courtney that he was just trying to keep Valdez from committing suicide.

Appellant left the house, went next door to help a neighbor, and then returned home. When Appellant returned, he told Valdez that he wanted his cell phone and

3

the keys to the vehicle. Valdez told Appellant that she did not have the cell phone or the keys. Appellant threatened to slice her throat and her daughter's throat and to cripple Valdez's son-in-law so that he could not hold his children. Appellant also told Valdez that, if the police got involved, they would never find him. Then, with cell phone and keys in hand, he finally left.

Later, during her interview with Investigator Fincher, Appellant sent a text to Valdez in which he informed her that her vehicle was in the parking lot of a Brownwood restaurant and that the keys were inside the restaurant. She told Investigator Fincher about the text. He went to the restaurant with Valdez, but there were no keys either in the car or in the restaurant. As we note below, deputies would later find the keys in Appellant's possession.

Appellant sent other texts to Valdez while she was with Investigator Fincher. In one of the texts, Appellant told Valdez that he was in room 103 in a motel across the street from the restaurant parking lot where he had left Valdez's vehicle. Valdez showed Investigator Fincher another text from Appellant. It read, "F--k the police."

Investigator Fincher, Investigator Carlisle Gover, and Deputy Joe Thomas went to the motel where Appellant had said that he had a room, and they arrested him. They found Valdez's keys, Appellant's cell phone, and a tablet in the motel room. He was "[v]ery upset, he seemed angry." Appellant cried, got angry, and then began to scream at Investigator Fincher and Deputy Thomas. Although Appellant did not want to participate in an interview with Investigator Fincher, he made various voluntary statements from the backseat of the patrol car. The in-car camera was running, and the trial court admitted the recording into evidence. The recording reflects Appellant's demeanor at the time of his arrest.

During the recording, Appellant can be heard to refer to one of the arresting deputies as a "piece of s--t." He also referred to the deputy as a "lying-ass mother . . . f-----g Obama piece of s--t." Additionally, he said that he hoped that he haunted

4

the officers at night. Appellant also informed the deputies that he was not afraid of their "f-----g guns and tasers." Appellant also said that he would not be in jail long and would be out "by the end of the night." He predicted that no charges would be filed and that they would "[c]heck [him] in and let [him] right out."

Appellant can be heard to refer to Valdez as a "c--t" and a "suicidal f-----g b---h" and can also be heard to predict that an incoming text was from Valdez and that, in that text, she would be apologizing for turning him in and would be referring to herself as "a f-----g liar." Appellant smelled of alcohol and was "a lot" intoxicated.

Investigator Fincher saw Valdez again the next day. Investigator Fincher gave her the keys to her vehicle. Valdez told him that the assault was her fault and asked about dropping the charges. Investigator Fincher told her she would have to talk to the district attorney's office. On January 21, 2014, Valdez signed an application to dismiss in connection with the assault charges against Appellant.

Although the State made many attempts to serve Valdez with a subpoena to appear as a witness in Appellant's trial, they were not able to serve her. Valdez did, however, come to the trial. She testified that she avoided the subpoenas because she thought that it would help Appellant if there were no witnesses. Further, she testified that it was hard to admit the things that she had to admit. Valdez also testified that she loved Appellant and did not want to "cut ties" with him.

As we have indicated, Valdez testified at trial; the State called her as a witness. She said that she was forty years old; that she had two children, one of whom was Courtney Bamber (who was married to Levi Bamber); and that she had granddaughters. She also testified that she and Appellant were living together at the time of trial.

Very little in Valdez's trial testimony matches the story that Investigator Fincher said that she told him on January 14, 2014, at the law

5

enforcement center. Valdez testified that she saw something on Appellant's tablet that made her think Appellant was being unfaithful and that she "just lost it." Valdez confronted him with the information, and Appellant denied it, which "infuriated" her. Appellant's demeanor was like hers, and they were screaming at each other and throwing things, "not necessarily at each other, but [she knew] that [they] both got hit by flying objects." They also shoved each other. Appellant held her by the arms to keep her from hitting him, but she "kept going at him."

Valdez testified that she left the house around 2:00 or 3:00 a.m. and went to a roadside park so that they could cool off. By this time, according to Valdez's trial testimony, she and Appellant had been drinking for twelve hours straight, and she had consumed more than a bottle of rum or some other kind of liquor.

Valdez stayed at the roadside park for "a couple of hours." During the time that Valdez was at the roadside park, she called and texted Appellant. During the conversations and in the texts, they were "saying rude things to each other."

When Valdez returned home, Appellant was asleep. Valdez woke Appellant and told him that he needed to leave. She testified, "I basically woke him up to start arguing again." They did not argue again at this point; however, Appellant left in Valdez's car and that angered her. Valdez testified that she "wanted him to leave, but then [she] got mad when he left."

Appellant returned after two or three hours, and he and Valdez began to argue again, "just throwing stuff and screaming." Valdez further testified that, when Appellant left this time, she called Courtney. She also testified that she told Courtney that she and Appellant had gotten into an argument and that he had hurt her and stolen her car.

Courtney and Levi arrived about an hour after Valdez called Courtney. It was in the afternoon when Courtney and Levi arrived and took Valdez to the police station; Valdez was not drinking then.

6

Valdez testified that she had had a drinking problem for a long time. According to Valdez's testimony, she went to the law enforcement center because, when she told Courtney about the argument and when Courtney saw the condition of the house, Courtney told Valdez that, if she did not go to the police station, she could not see her granddaughters anymore. Valdez further testified that she went to the police station because Courtney was "pissed off that [she] had been drinking"; Valdez was trying to put the blame on Appellant so that she could continue to see her grandchildren.

According to Valdez's testimony, she was extremely intoxicated when she went to the police station and when she talked with Investigator Fincher. Over the course of twelve to eighteen hours, she had consumed more than one bottle of liquor. She testified that she had stopped drinking "a couple of hours [or] a few hours" before she talked with Investigator Fincher. However, Valdez also testified that she "hadn't drank since early that morning, probably 4:00 or 5:00 in the morning." She testified: "I stopped drinking when he left later that day. Like I said, I don't know the time. I want to say it was early afternoon."

Valdez further testified that, when she talked to Investigator Fincher, she was "a mess." She said that her eyes were swollen from crying and that she bruised easily, "like if [her] dog jumps on [her]." She also testified that she always has dark circles under her eyes if she does not sleep much or if she has been drinking, "or things like that."

The State asked Valdez what she told Investigator Fincher about what had happened. Valdez responded, "I honestly don't remember much of it, of what I told him." In fact, Valdez testified that she did not remember the conversation with Investigator Fincher. She was not sure whether she remembered the bruises on her arm or if someone had told her about them. Valdez did not remember whether she told Investigator Fincher that Appellant pulled her by the hair and dragged her down

7

the hallway, that Appellant said that he would slice her throat, that Appellant said that he would slice Courtney's throat, or that Appellant said that he would cripple Levi. When pressed by the State, Valdez testified that she did not know whether Appellant had said those things or whether she had just made them up. She ultimately testified, "I don't know what [Appellant] said." Valdez did remember being hit in the head by "a conditioner bottle that was flying through the air."

Valdez testified that she was sore underneath her chin and jaw area but, for the first time, said that that those injuries were the result of "rough sex." The sex began after Valdez and Appellant had been drinking but before any altercations began. In her testimony in court, Valdez said that she had been wanting to experiment and had basically asked Appellant to choke her. "I'm guessing that he did not feel comfortable doing that, because he never placed his hand on my throat." Valdez also testified that she could not be sure whether they used soft restraints called "lover's cuffs"; she thought that one of her hands might have been tied, but not both. She did remember that they did not use the handcuffs that they had. According to Valdez's testimony, Appellant never impeded her normal breathing, and if Appellant put his hands on her throat, it was because she was willingly participating in the sexual act. She also testified that Appellant never displayed, threatened, or harmed her with a knife.

There was no mention of rough sex in either the application to dismiss or during the interview with Investigator Fincher.

Investigator Fincher testified that Valdez did not appear to be intoxicated when he met with her and that he did not see any signs of intoxication. He saw no signs that Valdez was not in her right mind. She appeared to have the ability to recall events and talked about specific things as opposed to things of a general nature. Valdez conversed with Investigator Fincher in a coherent and lucid manner. Although Valdez told Investigator Fincher that she felt like she had verbally

provoked Appellant, Investigator Fincher saw nothing to indicate that she was the physical aggressor. The bruises that Investigator Fincher saw on Valdez were consistent with the story that Valdez told him. Furthermore, Investigator Fincher testified that scratch marks on Valdez's breast and neck, as shown in photographs admitted into evidence, are consistent with a knife being dragged across her breast and neck.

When Investigator Fincher testified, Valdez had already testified. Near the beginning of Investigator Fincher's testimony, Appellant's trial counsel objected on hearsay grounds as to any testimony from Investigator Fincher about what Valdez had told him. Basically, Appellant's position was that the only possible reason to admit the testimony would be for impeachment purposes and that impeachment evidence is not substantive evidence. As an extension of that argument, Appellant claims on appeal that the State is not allowed to call a witness for the sole purpose of impeaching that witness.

In response, the State maintains that Valdez's statements to Investigator Fincher were admissible as exceptions to the hearsay rule under Rule 803(2) (excited utterance of the declarant) and under Rule 803(3) (a statement that relates to the then-existing mental, emotional, or physical condition of the declarant) of the Texas Rules of Evidence. TEX. R. EVID. 803(2), 803(3). The State further contends that, in any event, the statements are admissible as impeachment evidence.

First, we observe that Appellant is correct in that the State may not call a witness for the sole purpose of introducing impeachment evidence, but an important part of that restriction is that the State may not call a witness to impeach that witness for the sole purpose of introducing *otherwise inadmissible evidence*. Rule 607 of the Texas Rules of Evidence provides that any party may attack the credibility of a witness even if that party called the witness to testify. TEX. R. EVID. 607. But the State is not allowed to call a witness whom the State knows to be hostile when the

sole purpose is to elicit *otherwise inadmissible evidence*. *Hughes v. State*, 4 S.W.3d 1, 4 (Tex. Crim. App. 1999).

After it heard arguments from Appellant and the State, the trial court admitted the testimony as an excited utterance; as a then-existing mental, emotional, or physical condition; and as impeachment. If the trial court properly admitted the testimony as substantive evidence under an exception to the hearsay rule, then we do not reach the question of whether the State called Valdez solely for the purpose of getting inadmissible evidence before the factfinder.

We will first consider whether the trial court erred when it admitted the testimony under Rule 803(2), the excited utterance exception to the hearsay rule. We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Id.* We must uphold the ruling that the trial court made "if it is reasonably supported by the record and is correct under any theory of law applicable to the case." *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). Whether to admit evidence at trial is a preliminary question to be decided by the trial court. TEX. R. EVID. 104(a); *Tienda v. State*, 358 S.W.3d 633, 637–38 (Tex. Crim. App. 2012).

Here, the trial court correctly determined that Valdez's statements were hearsay. Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d); *see Willover*, 70 S.W.3d at 845. Generally, hearsay evidence is not admissible unless it falls within one of several exceptions. *See generally* TEX. R. EVID. 802 and 803 (pertinent to the case now before this court).

Did the trial court err when it allowed Investigator Fincher to testify under the excited utterance exception to the hearsay rule as to the statements that Valdez made

to him? As we have said, one of the exceptions to the hearsay rule allows hearsay testimony if it is an excited utterance. TEX. R. EVID. 803(2). The "excited utterance" rule provides that "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is not excluded by the rule against hearsay. *Id.*

In *McCarty*, the court set out three concerns a court should address when it determines the admissibility of a hearsay statement under the excited utterance exception. Those concerns are as follows: "(1) the 'exciting event' should be startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication; and (3) the resulting statement should be sufficiently 'related to' the startling event, to ensure the reliability and trustworthiness of that statement." *McCarty v. State*, 257 S.W.3d 238, 241 (Tex. Crim. App. 2008).

The spontaneous nature of the statement is the main factor to be considered when a court determines the admissibility of an excited utterance. *Tezeno v. State*, 484 S.W.2d 374, 379 (Tex. Crim. App. 1972). The declarant must have made the statement before the declarant's excitement that was caused by the startling event or condition had abated. *Sandoval v. State*, 409 S.W.3d 259, 284 (Tex. App.—Austin 2013, no pet.) (citing *Zulinai v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003)). This is so because the excited utterance exception is based upon an assumption that the person making the statement is not then capable of the kind of reflection that would enable her to fabricate the information that she related. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). The trustworthiness of the statement is founded on the fact that it is the event that speaks through the person and not merely the declarant relating the event. *Zuliani*, 97 S.W.3d at 595. And it is not necessary that the startling event be based on the original offense; the startling event may be a subsequent event, if it is itself a startling event. *See McCarty*, 257 S.W.3d at 240

11

(startling event may trigger spontaneous statement that relates to earlier incident). To be an excited utterance, the statement must be triggered by the shocking or startling event. *Harvey v. State*, 123 S.W.3d 623, 630 (Tex. App.—Texarkana 2003, pet. ref'd).

Valdez met with Investigator Fincher at around 5:30 p.m. on January 14, 2014. She said that she and Appellant had gotten into an argument the night before and that Appellant had been drinking. Appellant threw a conditioner bottle at her and hit her in the head with it. Valdez went into the bathroom, and Appellant closed the door to the bathroom; she could not open the door to get out of the bathroom. Appellant opened the door, knocked her down, took her pants off, called her a whore, dragged her out of the bathroom by her feet, kicked her on her legs and hips, grabbed her by the hair and dragged her down a hallway, put his forearm across her neck so that she could not breathe, and ran a knife across her throat and chest.

Valdez was able to stop the assault when she left and went to a roadside park. In her testimony, Valdez said that she went to the roadside park at around 2:00 or 3:00 a.m. Valdez also testified that, while she was at the roadside park, she and Appellant were calling and texting and saying mean, rude things to each other. She told Investigator Fincher that she spent the night there and returned home at 6:00 a.m. and that Appellant was apologetic and left the house. During trial, Valdez testified that, when she went home, she woke Appellant up to start arguing again. While Appellant was gone, he contacted Valdez to tell her that he was going to get some supplies to treat the injuries that he had caused.

However, Valdez had told Investigator Fincher that, when Appellant returned home, he had been drinking. Appellant became angry and threw a box of miscellaneous items at her. When she fell, Appellant got on top of her, put his forearm across her throat, and again caused her not to be able to breathe. Valdez said that "she felt dizzy, and her face felt like it was getting bigger and bigger and

12

was going to pop." She tried to get up, but Appellant flipped her over and grabbed her left arm and twisted it behind her back. During this time, Appellant was yelling at her.

Some ten minutes later, she was able to call Courtney. She either told Courtney on the phone or when Courtney came to get her that Appellant had hurt her. In any event, Valdez told Investigator Fincher that Appellant told her to tell Courtney that Valdez lied about what had happened. Appellant went next door to help a neighbor. When he returned to the house, he told Valdez that he wanted his cell phone and the keys to the vehicle. Valdez told Investigator Fincher that, when she told Appellant that she did not have them, Appellant told her that he would slice her throat, slice Courtney's throat, and cripple Valdez's son-in-law. Appellant told Valdez that, if she went to the police, the police would never be able to find him. Appellant left in Valdez's vehicle.

Valdez testified that Appellant was gone this time for "[m]aybe two or three hours" before Courtney and Levi got there. Valdez then corrected that testimony and said: "Well, no. He had gone and left for two or three hours. Then came back, and we argued again." Valdez also testified that "Courtney and Levi got there maybe an hour after [she] called them." At some point in time after Appellant left for the last time, and after Valdez called Courtney, and after Courtney and her husband Levi arrived at Valdez's house, they went to the law enforcement center. Investigator Fincher testified that he responded to the "walk-in for an assault report" about 5:30 p.m. on January 14, 2014. Valdez testified that they went there in the afternoon because it was still daylight when they got there. Investigator Fincher testified that, when Valdez came to the law enforcement center, she was "very very shaken visibly," that her hands were shaking, and that her voice indicated she was upset and scared. During the time that Valdez was talking with Investigator Fincher, Appellant was texting her. As evidence of his continuing attempt at control over Valdez, he

13

told Valdez in one of the texts where he had left her vehicle and keys when, in fact, he still had the keys in his motel room directly across the street from where he left her vehicle. Appellant's attitude and demeanor is further reflected in another text that Appellant sent to Valdez while she was talking to Investigator Fincher; he texted: "F--k the police." Valdez showed the text to Investigator Fincher.

Upon these facts, we hold that the trial court did not abuse its discretion when it admitted Valdez's statements to Investigator Fincher as excited utterances under Rule 803(2) of the Texas Rules of Evidence.

The record in this case is not such that there is a definite timeline as to the exact time that the alleged assaults began and when they ended. Basically, Valdez told of an assault that began on the night of January 13, 2014, and continued off and on throughout the night and at least a portion of the next day. We believe that the trial court could infer that Appellant continued to exercise control over Valdez through the time that Appellant sent Valdez false information about the location of her keys. The injuries to which Investigator Fincher testified, as well as the photographs that were admitted into evidence, confirm the severity of the assault. We believe that the events of the night and at least a portion of the next day were startling enough to evoke a truly *spontaneous* reaction from Valdez. The reaction to the assaults was quick enough to avoid the possibility of fabrication inasmuch as the ongoing assaults and the statements to Investigator Fincher were hours—not even a day—apart. Furthermore, the statements that Valdez gave were directly related to the startling events—the assaults—so as to ensure the reliability and trustworthiness of the statements that she made to Investigator Fincher. We overrule Appellant's first issue on appeal.

In his second issue on appeal, Appellant claims that his trial counsel provided ineffective assistance when counsel did not object when the State called Valdez as a witness for the sole purpose of impeaching her. We have held that the statements

14

made by Valdez to Investigator Fincher were admissible as substantive evidence. Trial counsel does not render ineffective assistance of counsel when he fails to object to admissible evidence. *Jackson v. State*, 846 S.W.2d 411, 414 (Tex. App.—Houston [14th Dist.] 1992, no pet.). We overrule Appellant's second issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


February 14, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[2]

Willson, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.