

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00238-CR

———————————————

JOSHUA LEE LAWRENCE, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR14757

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Opinion by Justice Walker

## OPINION

After a jury trial, Appellant Joshua Lee Lawrence was convicted of Trafficking a Child with Sexual Assault and sentenced to fifty-eight years' confinement. *See* Tex. Pen. Code § 20A.02(a)(7)(C). Lawrence appeals that judgment, challenging the legal sufficiency of the evidence to support the guilty verdict, various evidentiary rulings made by the trial court during the punishment phase of his trial, and the cumulative effect of those allegedly erroneous rulings on the punishment-phase verdict. We will affirm.

## I. BACKGROUND[1]

### A. GUILT/INNOCENCE TRIAL

Lawrence was thirty years old when he started communicating on the Snapchat social media application with complainant S.H., who was fourteen.[2] S.H. testified that she and Lawrence became Snapchat "friends" when she contacted him after seeing a picture of his penis that he had posted on his Snapchat account. After a few weeks of communicating, they decided to meet in person to drink and stay the night at a hotel together in her hometown of Granbury, Texas. Their plan was to have S.H. walk from her home to a nearby park where Lawrence would pick her up. On July 29, 2019, Lawrence picked S.H. up at the park, and they drove to a local liquor store

---

[1]The facts herein are drawn from the testimony and exhibits admitted at trial.

[2]Lawrence had told S.H. that he was only twenty-three years old.

where he purchased alcohol. He then drove them both to a restaurant to pick up dinner and finally to a local motel. At the motel, the two ate dinner, watched television, and drank the alcohol. They then started to play drinking games that included them removing their clothing. This escalated to the two touching each other's genitals and eventually to having sex. They then went to sleep.

The next morning, Lawrence drove S.H. to an apartment complex where she had a babysitting job. Soon after, S.H. told a friend that she had had sex with Lawrence. S.H.'s mother also became aware of what had happened and alerted the police.

Lawrence was arrested in Florence, Texas (where he worked as a firefighter). While under arrest and having been properly *Mirandized*, Lawrence admitted that he had met S.H. at the park, had driven her to the motel, and had sex with her at the motel. He maintained, however, that he had believed her to have been eighteen years old.[3] Evidence from the liquor store, motel, and area surveillance cameras corroborated that Lawrence was in Granbury and at those locations on the dates in question.

---

[3]S.H. testified that she had informed Lawrence via Snapchat that she was fourteen. During his police interview, Lawrence denied having seen any such message, explaining that sometimes Snapchat messages disappeared before he had the opportunity to read them.

## B. PUNISHMENT TRIAL

At the punishment phase of Lawrence's trial, a woman named Jillian Allan testified that her daughter, twelve-year-old J.A., had received Snapchat messages from a fireman who identified himself as being named Jakob. In the messages, J.A. told Jakob that she was twelve, and Jakob said that he was twenty-four. Jakob also told J.A. that she was beautiful, that he liked "boobs and butts," and that he had once had a threesome. Allan took screenshots of the messages and other information from Jakob's Snapchat profile and informed the police of the messages.[4] Jakob's account included a profile picture and, at trial, Allan identified Lawrence as the person in that picture. Lawrence objected to the admission of the screenshots on hearsay, inadequate authentication, and confrontation grounds, and the trial court overruled those objections.

Also at punishment, Steven Ried (a peace officer in the Texas Attorney General's digital forensics unit) testified about a digital extraction report[5] obtained

---

[4]Lawrence was arrested and charged in another county for online solicitation of a minor in connection with J.A.'s situation. In that case, police identified Lawrence as the person in Jakob's profile picture by using facial recognition software within Texas Department of Public Safety databases. That case was pending at the time of the instant trial.

[5]Ried explained that a digital extraction report is obtained by connecting an electronic device to multiple hardware systems that read all of the data on the device and then create a "full file system image" containing all of that data so that it can be more easily analyzed by investigators.

from Lawrence's electronic devices.[6]   Ried testified that he did not perform the extraction from which Lawrence's report was obtained; rather, the extraction had been performed by Dave Szyperski, a former colleague who had since retired and did not testify at trial.

In a discussion about the chain of custody of these devices, Ried explained that it is a best practice to set seized electronic devices into "airplane mode" so that the devices do not connect to the internet or a cellular network.  It is important that this not occur because if a seized device connects to an outside source, the information on the devices could be compromised.  Ried testified that, from what he had seen, Szyperski had performed the extraction correctly and that the report indicated that no irregularities had occurred during the extraction.  He could not, though, say for sure whether Szyperski had put the devices into airplane mode.

Lawrence objected to the admission of the extraction report on hearsay, inadequate authentication, and confrontation grounds, and the trial court overruled those objections.

Ried then testified using the extraction report as to five conversations that were found on Lawrence's devices between Lawrence and five people who told Lawrence that they were underage girls.  In the first conversation, he spoke with a girl who stated that she was seventeen.  Lawrence complimented the girl's appearance based

---

[6]The devices themselves were unlocked and also admitted into evidence.

on a photo she had sent him and told the girl that he was twenty-three. She asked him if he was "sensitive about age" to which he replied that he was "good with under age" and that "[u]sually girls like older guys and guys like younger girls." Lawrence then told the girl that her age did not bother him and that he was a "good friend to have" because he could "buy alcohol and stuff."

In the second conversation, another girl told Lawrence that she was fourteen years old, and Lawrence told her that he was "fine with [that]," that he could be her big brother, and that there was nothing wrong with them just being friends. He told the girl that he would like to hang out with her, but she did not respond in kind.

In the third conversation, Lawrence told a girl that he was twenty-three and a firefighter. He asked her if she liked firefighters and she said, "Yeah, but I'm way too young." She then told him that he was too old for her, but he assured her that they could still be friends.

In the fourth conversation, Lawrence asked another girl to describe her body, to which she responded, "Petite but curvy around the waist and legs." Lawrence said, "Oh, wow. Sounds nice. I like how you sound." He then told her that he was twenty-two years old, and she told him that she was seventeen. On Lawrence's request, the girl sent him a photo of herself. He told her that he was eager to see her in person and that she "look[ed] great" and had "nice legs, butt, stomach, arms, [and] face." Later in their conversation, Lawrence asked if she liked "ass massages." When

6

she replied in the affirmative, he told her that they should "give each other booty massages."

The fifth conversation occurred between Lawrence and a girl who said she was fifteen. He told the girl that he was twenty-two, that it was "good to have older friends," and that he was okay with her age if she was okay with his. He also told the girl that he was a good friend to have because he could buy alcohol. He asked her on a number of occasions if she wanted to meet in person, inviting her to his house and suggesting that he could pick her up from a friend's house. She told him that he was too old for her and that her parents were strict; Lawrence again responded that they could just be friends.

## II. DISCUSSION

Lawrence raises four issues on appeal: (1) the evidence was legally insufficient to support the jury's verdict that he committed the crime of child sex trafficking; (2) the trial court abused its discretion by admitting the Snapchat screenshots between him and J.A. because they were not properly authenticated; (3) the trial court abused its discretion by admitting the extraction report because its authentication was based on inadmissible hearsay; and (4) the cumulative error in admitting the Snapchat screenshots and extraction report affected his substantial rights and cast doubt on the integrity of the punishment verdict.

## A. LEGAL SUFFICIENCY

In his first issue, Lawrence argues that the evidence was legally insufficient to support the guilty verdict because his conduct did not actually constitute "trafficking" under a proper interpretation of Texas Penal Code Section § 20A.02(a)(7) (the Trafficking Statute).

### 1. Standard of Review and Relevant Law

Usually, we review for legal sufficiency of the evidence by asking whether, after viewing the evidence in the light most favorable to the State, a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Liverman v. State*, 470 S.W.3d 831, 835–36 (Tex. Crim. App. 2015). But in some cases, our review turns on the meaning of the statute under which the defendant has been charged, thus we must ask whether his conduct actually constituted an offense under the statute. *Id.* at 836. That question is one of statutory construction that we review de novo. *Id.*

"In construing a statute, we give effect to the plain meaning of its language, unless the statute is ambiguous or the plain meaning would lead to absurd results that the legislature could not have possibly intended." *Id.* To determine plain meaning, we read words and phrases in context and construe them according to the normal rules of grammar and usage. *Id.* Only if the statute is ambiguous or its plain meaning would lead to absurd results do we look to extratextual factors, such as legislative history. *Id.*

The Trafficking Statute provides that a person commits the offense of trafficking a child if he knowingly "traffics a child . . . and by any means causes the trafficked child . . . to engage in, or become the victim of" a sexual crime, including sexual assault under Section 22.011 of the Penal Code. Tex. Penal Code Ann. § 20A.02(a)(7)(C); *see id.* § 22.011(a)(2) (providing elements for sexual assault of a child). "Traffic" is defined as "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id.* § 20A.01(4).

## 2. Analysis

According to Lawrence, the Trafficking Statute is ambiguous because a "common-sense" reading of the statute demonstrates that he did not commit trafficking. In his view, when the legislature enacted the Trafficking Statute it intended that, for one to be guilty of trafficking, there must have been at least two perpetrators involved: the trafficker and the beneficiary. Pointing to the legislative history, he posits that trafficking is understood as "the illegal trade of human beings" that takes place as part of a larger criminal enterprise. He says that interpreting the statute as broadly as the State did against him would lead to the absurd result of nearly every sexual offense against children qualifying as trafficking because most of those offenses include instances of transporting, enticing, or recruiting a child. A further absurdity could occur because such an interpretation would punish more violent, forced sexual assaults on children where there was no evidence of enticement or transport of the child as second-degree felonies, while punishing offenses such as

9

his—which he characterizes as "unforced sexual offenses against children"—as first-degree felonies simply because they involved enticement or transport.

We acknowledge that Lawrence's conduct would not constitute what is colloquially understood to be human trafficking. There were, for instance, no allegations that he bought, traded, or sold S.H. or forced her into sexual labor. *See Ritz v. State*, 481 S.W.3d 383, 386 (Tex. App.—Austin 2015, pet. dism'd). Such traditional notions, though, do not spearhead our statutory analysis in this case. Instead, if the statute's plain text is unambiguous and would not lead to absurd results, then we are to look no further than its plain meaning to determine if Lawrence's actions constituted an offense. *See Liverman*, 470 S.W.3d at 836.

The State points to our sister court's opinion in *Ritz* to support its view that the Trafficking Statute's plain meaning is unambiguous and would not lead to absurd results. *See Ritz*, 481 S.W.3d at 384–86. The issue and arguments raised in *Ritz* are materially the same as here. There, Ritz was convicted of continuous child trafficking after he drove a fourteen-year-old girl (on multiple occasions and over the course of several months) in his vehicle to another location so the two could have sex. *Id.* at 384. Ritz argued on appeal that the evidence was legally insufficient to support his conviction because it did not prove that he had "trafficked" the child. *Id.* The Austin court held that, under the plain language of the statute, Ritz did engage in trafficking:

> [T]he current language of the statute is broad, and we cannot conclude
> that Ritz did not 'transport' [the victim] when he drove her to his home
> in order to have sex with her. As long as a statute is constitutional (and

10

Ritz has not challenged the constitutionality of this statute), we must enforce the statute as it was written, not as it might or even should have been written. *See Boykin* [*v. State*], 818 S.W.2d[ 782, ] 785[ (Tex. Crim. App. 1991)] (courts seek to effectuate intent of legislators 'because our state constitution assigns the law making function to the Legislature while assigning the law interpreting function to the Judiciary'); *id.* ('Where the statute is clear and unambiguous, the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute.') (internal quotation marks omitted).

*Id.* at 386.[7]

On the topic of whether the statute's broad, plain meaning would lead to absurd results, the *Ritz* court noted that "it is possible that the legislature wished to significantly increase the sentences available for persons who commit sexual crimes involving children by including all such crimes under the 'trafficking' umbrella." *Id.* It further noted that it was possible that the legislature intended to classify the simple transport of children as trafficking because it felt "that removing a child from the

---

[7]The Court of Criminal Appeals initially granted discretionary review in *Ritz*, but later dismissed the petition. *See Ritz v. State*, 533 S.W.3d 302, 303 (Tex. Crim. App. 2017). Judge Newell (joined by three colleagues) wrote in a concurring opinion that "there was no room for material improvement on the [Austin] court of appeals' opinion" and that "reaching the contrary conclusion [would require] [the Court of Criminal Appeals] to redraft the statute to add terms that [the] legislature did not include and risk[ed] substituting [the court's] policy considerations for those of [the] legislature." *Id.* at 303 (Newell, J., concurring). This brought a sharp dissent from Presiding Judge Keller (joined by Judge Walker), who saw things differently: namely, that the statute was ambiguous and such a broad construction would lead to absurd results. *Id.* at 311–12 (Keller, P.J., dissenting). Instead, she concluded that the legislature intended to punish trafficking "only when the trafficker and the sex-offense perpetrator are different people." *Id.* at 314–15.

11

safety of her own home and driving her miles away" to a secluded location in order to sexually assault her was "particularly egregious conduct."[8] *Id.*

We are persuaded by the reasoning and appellate histories of *Ritz* and *Griffin* that the issue here is settled: the plain meaning of the Trafficking Statute includes Lawrence's driving of S.H. to the motel within its definition of "traffic." *See* Tex. Penal Code Ann. § 20A.01(4); *see also* Transport, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/transport (last visited June 10, 2024) (defining "transport" as meaning "to transfer or convey from one place to another"). The evidence is undisputed that Lawrence picked the fourteen-year-old S.H. up in his truck, drove her to the motel, and had sex with her. Under the plain text of the statute, this evidence is legally sufficient to prove that Lawrence committed the offense of trafficking a child under Section 20A.02(a)(7). We overrule Lawrence's first issue.

---

[8]The Austin court considered this issue again in *Griffin* and came to the same conclusion. *Griffin v. State*, No. 03-19-00429-CR, 2020 WL 7640149, at *5 (Tex. App.—Austin Dec. 23, 2020, pet. ref'd) (mem. op., not designated for publication). And again, the Court of Criminal Appeals declined to upset that opinion, with Judge Newell noting in a concurring opinion that the issue had been settled as nothing had changed since *Ritz;* notably, the United States Supreme Court had "recently denied review on a case in which the defendant raised constitutional challenges to the [Trafficking Statute] based upon the same arguments" rejected in *Ritz* and *Griffin*, and the Texas legislature had met on multiple occasions since the *Ritz* opinion and declined to change the statute. *Griffin v. State*, 662 S.W.3d 470, 473 (Tex. Crim. App. 2021) (Newell, J., concurring).

## B. EVIDENTIARY RULINGS

In his remaining three issues, Lawrence contends that the trial court abused its discretion by admitting Allan's Snapchat screenshots and the extraction report at his punishment trial and that the cumulative effect of those errors cast doubt upon the jury's punishment verdict.

### 1. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion, meaning that we will not intercede "as long as the trial court's ruling was at least within the zone of reasonable disagreement." *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); *see Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008). "If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

### a. Snapchat screenshots

In his second issue, Lawrence argues that the trial court abused its discretion by admitting the screenshots of J.A.'s Snapchat conversation with "Jakob." He contends that, because Allan could not properly authenticate whether Lawrence and Jakob were the same person, the entirety of that conversation constituted inadmissible hearsay. He says this error was harmful because the screenshots were used by the State to "paint a portrait of [him] as a serial online solicitor of minors for sexual purposes." The State responds that there was enough admitted evidence to support the

13

reasonable determination that the screenshots were authentic[9] and that, even if error occurred, it was harmless.

We agree with the State's latter point and, assuming without deciding that the trial court abused its discretion by admitting the Snapchat screenshots, we will hold that any such error was harmless. *See McCurely v. State*, 653 S.W.3d 477, at 493 (Tex. App.—Fort Worth 2022, pet. ref'd) (assuming error and holding that any assumed error was harmless).

The erroneous admission of evidence is nonconstitutional error governed by Rule 44.2(b). *Ivey v. State*, 250 S.W.3d 121, 126 (Tex. App—2007) *aff'd* 277 S.W.3d 43 (Tex. Crim App. 2009). Under Rule 44.2(b) we will disregard the error unless it affected the defendant's substantial rights. Tex. R. App. P. 44.2(b). This requires us to view the entire record and reverse the judgment only if we conclude that the error had a substantial influence on the outcome of the proceeding. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002). In the case of punishment-phase evidentiary rulings, it must be demonstrated that the defendant received a longer sentence or was harmed by the admission of the complained-of evidence. *See Ivey*, 250 S.W.3d at 126. In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony

_____

[9]For instance, "Jakob's" profile picture was a picture of Lawrence, and various personal information disclosed in the conversation were consistent with Lawrence's personal information.

14

or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

The record here does not demonstrate that Lawrence would have received a lesser sentence if the Snapchat screenshots had not been admitted. The screenshots included an exchange between "Jakob" and J.A. in which Jakob discussed personal and sexual material that (most reasonable minds would agree) should not be discussed between a twelve-year-old and an adult. However, it was a brief, single conversation that did not include any illicit images or requests by Jakob to meet J.A or to engage in sexual contact.

In addition to the screenshots, the State proffered evidence of five conversations that had occurred between Lawrence and other girls that purported to be underage.[10] In those conversations, Lawrence makes similar sexually-suggestive comments and, in some instances, encourages them to send pictures and to meet him in person.

The evidence at trial showed that Lawrence had hatched a plan for S.H. to meet him at a park near her home so that he could take her to a motel and have sex

---

[10]In his third issue, Lawrence also challenges the admission of these five conversations but, as we will explain below, those conversations were admitted without error.

with her. His conviction was based not only on S.H.'s testimony at trial, but on Lawrence's own admissions to law enforcement that corroborated many details of the alleged offense. For this, Lawrence was convicted of a first-degree felony for trafficking and sexually assaulting the fourteen-year-old child. Thus, Lawrence faced the potential of life in prison for his conviction, yet the jury sentenced below that maximum punishment, instead assessing a fifty-eight year sentence. *See* Tex. Penal Code Ann. § 20A.02(b) (providing that trafficking a child is a first-degree felony); *see also id.* § 12.32 (providing that first-degree felonies are punishable by imprisonment for "life or any term of not more than 99 years or less than 5 years.").

In light of the entire record—specifically the briefness of his conversation with J.A., the fact that other admissible evidence was before the jury that Lawrence engaged in sexually-suggestive conversations with five other underage girls, the strength of the evidence against him (including his own admissions), and the fact that the jury sentenced him below the maximum available sentence—we conclude that the trial court's assumed error did not have a substantial or injurious effect on the jury's sentence and did not affect his substantial rights. *See Ivey*, 250 S.W.3d at 126. Thus, we must disregard the assumed error. *See* Tex. R. App. P. 44.2(b).

### b. Extraction report

In his third issue, Lawrence argues that the trial court abused its discretion in admitting the extraction report compiled from his electronic devices because Ried could not properly authenticate the report as he could not testify as to whether the

16

devices had been placed on airplane mode. Thus, says Lawrence, Ried's testimony that the report had been properly completed was based on inadmissible hearsay.

Texas Rule of Evidence 901(a) defines authentication as a "condition precedent" to admissibility of evidence that requires the proponent to make a threshold showing that would be "sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a); *see Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). In performing its gatekeeping function of admitting evidence, the trial court must simply decide whether the proponent of the evidence has supplied facts sufficient to support a reasonable jury determination that the evidence is authentic. *Tienda*, 358 S.W.3d at 638. Rule 901 "does not erect a particularly high hurdle"—in fact, the trial court need not itself be persuaded that the evidence is indeed authentic. *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.— Austin, 2012, no pet.); *see Tienda*, 358 S.W.3d at 638. Further, the proponent of the evidence is not required to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd) (internal quotations omitted). Instead, the ultimate question of authenticity is left to the jury as factfinder. *Tienda*, 358 S.W.3d at 638.

The trial court's decision to admit the extraction report had a reasonable legal basis. It may be true that Ried could not explicitly say that Szyperski had placed the devices into airplane mode, but he was able to say that the report showed no

irregularities. Also, the devices from which the report drew all of its data were admitted into evidence and available to Lawrence for purposes of cross-examination and determining whether the report contained mistakes or unreliable results. In fact, Lawrence never challenged that the devices were his nor did he identify to the trial court any alleged errors contained in the report showing that the devices had been compromised by not being put into airplane mode.

Accordingly, given the low admissibility hurdle and the fact that the trial court's ruling was based on facts that placed it within the zone of reasonable disagreement, we hold that the trial court did not err in admitting the extraction report. *See Tienda*, 358 S.W.3d at 638. We overrule Lawrence's third issue.

### c. Cumulative error

In his fourth issue, Lawrence complains that the trial court's cumulative error in admitting the Snapchat screenshots and the extraction report affected his substantial rights "by synergistically casting doubt upon the integrity of the jury's punishment verdict."

The doctrine of cumulative error provides that the cumulative effect of several errors can, in the aggregate, constitute reversible error, even though no single instance of error would. *Schmidt v. State*, 612 S.W.3d 359, 372 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). But, having assumed only a single error and finding that even that error was harmless, there are no errors to cumulate in this case. *See Cory v. State*, No. 02-23-00026-CR, 2024 WL 2854771, at *20 (Tex. App.—Fort Worth June 6,

18

2024, no pet. h.) (mem. op., not designated for publication). We overrule Lawrence's fourth issue.

### III. CONCLUSION

Having overruled all of Lawrence's issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Publish

Delivered: July 3, 2024