

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00138-CR

_____

JOSHUA THOMAS FULBRIGHT, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 97th District Court
Clay County, Texas
Trial Court No. 24-039-DCCR-0050

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant Joshua Thomas Fulbright appeals his conviction for capital murder, arguing that (1) his indictment was constitutionally flawed because the State increased his charge to capital murder out of prosecutorial vindictiveness; (2) there was insufficient evidence that he knew his actions would cause death; and (3) the trial court abused its discretion in two of its rulings on the admission of evidence. Because (1) the State overcame any presumption of prosecutorial vindictiveness; (2) both the record and common sense supported the jury's mens rea finding; and (3) the trial court did not abuse its discretion, we will affirm.

## I. Background

In mid-2018, Fulbright began dating S.T. (Susan).[1] And around the same time, Susan and her two-year-old daughter S.O.A.N. (Opal) moved in with Fulbright, sharing the bedroom that he rented in his friends' home. Less than six months later, Opal was dead.

Fulbright and Susan were indicted for felonies related to Opal's death, and Fulbright's case proceeded first. But as Fulbright's case proceeded, the charges against him evolved.

---

[1]To protect the minor victim's identity, we use aliases for her and her mother. *See* Tex. R. App. P. 9.10(a)(3); *Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *1 n.1 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication).

## A. Mistrials and Reindictments

Initially, in 2018, Fulbright was indicted for the first-degree felony offense of injury to a child, *see* Tex. Penal Code § 22.04(a)(1), (e), and the elected district attorney (Elected Attorney[2])—who had relatively little trial experience at the time—served as the lead prosecutor.[3] But during voir dire, a significant number of prospective jurors indicated that they could not consider the full range of punishment because they could not recommend probation for a defendant who had killed a child. Consequently, the parties ran out of prospective jurors—they "busted the panel"— and Fulbright's trial was rescheduled.

In the meantime, Elected Attorney hired an attorney with more trial experience (Experienced Attorney), and Experienced Attorney took over Fulbright's case. When she did so, Experienced Attorney recommended—and Elected Attorney agreed to— reindicting Fulbright for the charge of murder.[4]

---

[2]By the time of trial, Elected Attorney was no longer the district attorney. However, she confirmed that she had served as the district attorney when Opal died and when Fulbright's three indictments—for injury to a child, murder, and capital murder—were returned.

[3]Elected Attorney later explained that she had handled just "one first chair trial" prior to taking office as district attorney, she had tried just "point and shoot" cases during her time as district attorney, and she had no experience with cases involving "traumatic head injury." Nonetheless, Elected Attorney's office was small, so she served as the lead prosecutor at Fulbright's first trial.

[4]Elected Attorney and Experienced Attorney later explained their desire to avoid the probation issue that had busted the panel during Fulbright's first trial and

Fulbright's case thus proceeded to a second trial—now for murder. At the last minute, Susan agreed to testify against him, strengthening the State's case. But the trial hit a snag.

Over a weekend break in the testimony, Fulbright's lead trial counsel was arrested for driving while intoxicated with a child passenger, and his arrest was heavily publicized in the area. Fulbright moved for a mistrial on this basis, citing the risk that his counsel's publicized arrest would influence the jury and deprive him of a fair trial and effective assistance of counsel. The State agreed to the mistrial, and the trial court granted it.

Fulbright was then set for a third trial. But before his third trial, the prosecutor handling his case changed again.[5] This time, another Texas district attorney's office— a larger office with more resources than Elected Attorney's—agreed to assist with the case. The chief of the larger office's child-abuse division (Specialized Attorney) committed to serving as a special prosecutor on Fulbright's case, and the office indicated that it would send a full trial team to help. Almost immediately, when

---

their desire to avoid complex legal concepts, such as felony murder, that would be hard to explain to the jury.

[5]After the mistrial, Experienced Attorney was no longer available to serve as lead counsel. Meanwhile, Elected Attorney attended a conference, at which she learned of a larger district attorney's office that provided special prosecutors or trial teams to assist rural counties with significant cases.

Specialized Attorney reviewed the case file, she recommended—and Elected Attorney again agreed to—reindicting Fulbright for the increased charge of capital murder.[6]

Fulbright later protested the reindictments, particularly the reindictment increasing his charge from murder to capital murder. He moved for relief,[7] arguing that because the State had reindicted him for capital murder after his exercise of his constitutional rights to effective assistance of counsel and a fair trial, the circumstances gave rise to a presumption that the increased charge had been motivated by prosecutorial vindictiveness.

The trial court held an evidentiary hearing on the matter. At the hearing, both Elected Attorney and Experienced Attorney testified, and the trial court received an

---

[6]From the record, it appears that neither Specialized Attorney nor her corresponding trial team ended up trying Fulbright's case. After Fulbright's reindictment for capital murder, a new district attorney replaced Elected Attorney, and the new district attorney tried the case.

[7]Fulbright first raised his prosecutorial vindictiveness complaint in a motion for new trial. *Cf. Neal v. State*, 150 S.W.3d 169, 175 (Tex. Crim. App. 2004) (holding appellant forfeited his prosecutorial vindictiveness complaint when he "never filed a motion to dismiss or quash the indictment" but instead raised the issue at sentencing). And on appeal, Fulbright argues that, if he prevails on his prosecutorial vindictiveness complaint, the appropriate remedy is a new trial. However, Fulbright does not explain how a new trial for capital murder could "neutralize the taint" of the alleged prosecutorial vindictiveness that resulted in his indictment for capital murder. *Cf. State v. Gabaldon*, 727 S.W.3d 1, 15–24 (Tex. Crim. App. 2025) (discussing appropriate remedy for prosecutorial vindictiveness, explaining trial court's authority to "neutralize the taint," and holding dismissal without prejudice was proper remedy in that case); *Neal*, 150 S.W.3d at 176–77 (characterizing prosecutorial vindictiveness complaint as "complaining that the trial should never have taken place because the indictment was defective or should have been dismissed or quashed").

5

affidavit from Specialized Attorney as well. Elected Attorney attributed her initial failure to indict Fulbright for capital murder to her own inexperience. She explained his two reindictments by pointing to Experienced Attorney's and Specialized Attorney's levels of experience and recommendations, as well as to the perceived strength of the State's evidence—which grew as Elected Attorney saw the prospective jurors' inability to consider probation and heard Susan's testimony. Elected Attorney confirmed that the changes in Fulbright's charges were "not [at] all" punishing Fulbright for the mistrials and that "that [had n]ever come into factor or play."

Specialized Attorney, too, averred that her recommendation for an increased charge of capital murder was based "solely on the facts of the case and the applicable law." She explained that she had recommended the reindictment after researching the mens rea requirements for capital murder and "conduct[ing] a thorough review of the evidence," concluding that "the existing charge [of murder] did not adequately reflect the severity of the conduct."[8]

Fulbright did not factually dispute this explanation. Rather, he asserted that, to overcome the presumption of prosecutorial vindictiveness, the State was required to "show that it was impossible to bring more serious offenses at the time of the first

---

[8]Elected Attorney explained that, before Fulbright's case, she had "never actually charged anything under [the capital murder statute]." Consistent with this, Specialized Attorney stated that, when she recommended reindicting Fulbright for capital murder, she provided Elected Attorney with proposed charging language.

trial," and because the State had not made such a showing, he was entitled to relief. The trial court denied Fulbright's motion.

## B.    Trial Evidence and Rulings

Fulbright's case proceeded to a third trial on the capital murder charge. Numerous emergency responders, doctors, and law enforcement personnel testified, describing Opal's condition in detail. Their testimony and documentation showed that, by the time Susan and Fulbright brought Opal to the hospital in October 2018, the toddler was unresponsive, she was littered with bruises from head to toe— including a large bruise covering her temple—and she had brain swelling, a torn dura, a torn bridging vein, a subdural hemorrhage, and bilateral retinal hemorrhages, among other injuries. She never regained consciousness and died several days after arriving at the hospital. The medical examiner attributed her death to blunt force injuries to the head, noting more than five different areas of impact.

Initially, Fulbright and Susan claimed that Opal's injuries were no one's fault, telling the hospital staff and law enforcement that Opal was clumsy, had fallen in a parking lot, had been knocked over by a dog, and had fallen in the bathroom and hit her head. But that story quickly broke down, and by the time of trial, there was no

dispute that Opal's fatal injuries were caused by abuse.[9]  The question was who had abused her.

Susan blamed Fulbright.  She told the jury that Fulbright would punish Opal by "pop[ping]" her with a towel, hitting her with a belt or wooden slats, having her do "wall sits," and (later) punching her in the stomach or head.[10]  Then, around October 11—four days before Opal's hospital visit—Fulbright "came home and [Opal had] messed and he punched her really hard in the head."  Susan described how, after Fulbright hit Opal, he "picked her up and . . . shoved her into the closet," "pushing her chest . . . hard" such that Opal "hit her head . . . [o]n the back of the closet." According to Susan, Opal became less verbal after this episode of abuse, and she began having "at least one [seizure] a day."  Susan told the jury that, although she wanted to take Opal to the doctor,[11] Fulbright resisted until eventually one of their housemates pressed the issue.

Early on, while Opal was still in the hospital, Fulbright confessed to having hit her in the head.  The two law enforcement officers who spoke with Fulbright at the

---

[9]Fulbright questioned the timing of Opal's fatal injuries—how far in advance of her hospital visit they had occurred—but he did not dispute that she had died as the result of abuse.

[10]According to Susan, in late September or early October 2018, Opal began throwing up, she had her first seizure, she "did . . . not move as much, [and] when she did move[,] she seemed more wobbly."

[11]Susan did not have a vehicle or a driver's license.

8

hospital—a detective and a deputy—recalled Fulbright admitting that, a few days before the hospital visit, Opal "had poop on herself and the walls and the clothes and everywhere," and he had "lost it" and "hit her so hard that he thought he broke his hand." The detective told the jury that Fulbright's "hand [was] hurting so bad, he thought that his fingertips were gonna explode" and that he was "rubbing his fingers" as he described the pain. Fulbright repeated and elaborated on this confession in a videotaped interview with law enforcement and in a subsequent jailhouse phone call.[12]

However, by the time of trial, Fulbright had recanted. He told the jury that Susan had been the abuser and that he had lied to protect her.[13] And, in keeping with this defensive theory, Fulbright attacked Susan's credibility,[14] seeking to exclude evidence that aligned with her account while offering expert testimony that called her character into question. This led to two evidentiary rulings of particular relevance to this appeal.

---

[12]In Fulbright's videotaped interview, he stated that he had "got[ten] angry and [had] slapped [Opal] harder than [he] thought [he] did"—"hard enough to make . . . the tips of [his] fingers g[e]t hard."

[13]Fulbright related two "fits of rage" in the weeks leading up to Opal's death, describing how Susan had "[g]rabb[ed Opal] by the arm and h[e]ld her up and sw[u]ng," then gotten on top of her and "beat[en] her . . . really badly in the face."

[14]Fulbright emphasized Susan's mental health issues, eliciting testimony that she had been diagnosed as "Bipolar Type I . . . with Psychotic Features"—a diagnosis Susan insisted was inaccurate.

### 1. Facebook records

First, Fulbright objected when the State offered Facebook records to corroborate Susan's testimony. The records filled more than 11,000 pages and reflected Susan's Facebook profile, messages, posts, and activity—much of which involved Fulbright.

Before the records were offered, Susan testified to her Facebook user name, to Fulbright's Facebook user name, and to the fact that she and Fulbright frequently "texted over Facebook Messenger." The records themselves were consistent with this and contained numerous references to real-world events and photographs of Susan, Fulbright, and Opal. Additionally, when the State offered these records into evidence, it accompanied them with two business records certificates from Facebook employees who confirmed that the documents were "made and kept by the automated systems of Facebook in the course of regularly conducted activity . . . [and] at or near the time the information was transmitted by the Facebook user."

But Fulbright objected to the documents' admission as business records. He argued that, because the contents "weren't made by an employee of Facebook," they could not be considered business records, and the accompanying business records certificates were "deficient because [they] d[id]n't say who made it by an employee." The trial court overruled the objection.

## 2. Dr. Sabine's testimony

In the second evidentiary ruling relevant to this appeal, the trial court excluded portions of testimony from one of Fulbright's witnesses.

Fulbright called a clinical psychologist—Dr. David Sabine—to testify regarding his in-person evaluation of Fulbright, his opinion of Susan based on her mental health records and prior testimony, and whether Fulbright's or Susan's character traits made them likely to engage in certain behaviors. The trial court heard and ruled on the State's objections to this testimony over the course of two days.

On the first day, Dr. Sabine testified outside the jury's presence. He opined that, based on his in-person evaluation of Fulbright, Fulbright exhibited characteristics consistent with two personality disorders. Dr. Sabine further identified a list of characteristics commonly seen in child abusers, and he discussed whether Fulbright or Susan exhibited those traits. The State objected on numerous grounds, including Fulbright's failure to provide timely notice of the testimony, and the testimony's being more prejudicial than probative. The trial court took the matter under advisement, and the trial recessed for the weekend.

When the proceedings resumed the following week, the trial court excluded Dr. Sabine's testimony. It enunciated several grounds for its ruling, including that Dr. Sabine's testimony was more prejudicial than probative as to Susan and more

confusing than relevant as to Fulbright.[15]  *See* Tex. R. Evid. 403.  But, after the ruling, Fulbright sought clarification regarding whether Dr. Sabine could still discuss Fulbright's observed personality disorders.  There ensued a discussion of whether the State had received timely notice, what testimony Fulbright proposed presenting, and what the State did and did not have objections to.  As relevant here, Fulbright clarified that he proposed having Dr. Sabine testify regarding not only Fulbright's personality disorders but also whether those disorders made Fulbright likely to "take the rap" for Susan by falsely confessing—a topic slightly different than that focused on in Dr. Sabine's testimony the week before.  The State indicated that it had no objection to Dr. Sabine's discussion of Fulbright's observed personality disorders, but it objected to the false-confession-related character testimony, reiterating its lack of notice, among other issues.  The trial court sustained the State's objection, concluding that Dr. Sabine could not testify to "character in conformity with the diagnosis" and could "strictly testify to generally what the diagnoses are and what the symptoms are of the diagnoses."  Thus, when Dr. Sabine took the stand before the jury, his testimony was limited to Fulbright's observed personality disorders.

---

[15]The trial court also concluded that the testimony was improper impeachment and invaded the province of the jury.

12

## C.      Verdict and Judgment

Ultimately, after hearing all of the evidence, the jury found Fulbright guilty of capital murder. *See* Tex. Penal Code § 19.03(a)(8).  The trial court entered judgment accordingly, sentencing Fulbright to life in prison without parole. *Id.* § 12.31(a)(2).

## II.  Discussion

On appeal, Fulbright argues that (1) his indictment was constitutionally flawed because the State failed to rebut the presumption that it acted out of prosecutorial vindictiveness when it reindicted him for capital murder; (2) the evidence was insufficient to support a jury finding that he acted intentionally or knowingly when he caused Opal's death; and (3) the trial court abused its discretion by relying on deficient business records certificates to admit the Facebook records and by limiting Dr. Sabine's testimony.[16]

---

[16]Fulbright structures his complaints in five issues, arguing that (1) the trial court erred by limiting Dr. Sabine's testimony; (2) Fulbright's constitutional rights were violated because the State failed to overcome the presumption of prosecutorial vindictiveness; (3) to the extent that his prosecutorial vindictiveness complaint was not adequately preserved, his trial counsel was ineffective; (4) the evidence was insufficient to support a finding that Fulbright intentionally or knowingly killed Opal; and (5) the trial court erred by admitting the Facebook records.  We restructure his complaints for organizational purposes, and we assume without deciding that Fulbright's prosecutorial vindictiveness complaint was adequately preserved. *Cf. Neal*, 150 S.W.3d at 175–80 (discussing preservation of prosecutorial vindictiveness complaint).

**A.      Vindictiveness:  The State overcame any vindictiveness presumption.**

Fulbright first argues that the State violated his right to due process when it reindicted him for the increased charge of capital murder following his successful exercise of his constitutional rights.

"[A] decision to prosecute violates due process when criminal charges are brought in retaliation for the defendant's exercise of his legal rights." *Neal*, 150 S.W.3d at 173.  Thus, generally, if a defendant's conviction is reversed on appeal and, on retrial, the State increases the defendant's charge or adds new enhancements, there is a presumption that the State acted out of prosecutorial vindictiveness. *Hood v. State*, 185 S.W.3d 445, 448 (Tex. Crim. App. 2006); *Neal*, 150 S.W.3d at 173.  According to Fulbright, the presumption also arises here because the State increased his charge after he obtained a mistrial to preserve his constitutional rights.[17]  *Cf. Neal*, 150 S.W.3d at 173–74 (noting that the vindictiveness presumption arises in "very few situations").  But even assuming that a presumption of vindictiveness arose, the State could—and did—overcome it.

To overcome a presumption of prosecutorial vindictiveness, the State must "provide an explanation of the [increased charge or] additional enhancement[] that is unrelated to the defendant's exercise of his legal right to appeal." *Hood*, 185 S.W.3d at 448 (internal quotation marks omitted).  The trial court is the factfinder in this

---

[17]The State disputes that a presumption of vindictiveness arose.

14

analysis; it "decides the issue based upon all of the evidence, pro and con, and the credibility of the prosecutor's explanation." *Id.*; *Neal*, 150 S.W.3d at 174; *see Gabaldon*, 727 S.W.3d at 15 (reviewing dismissal for prosecutorial vindictiveness and recognizing that the appellate court must "afford almost total deference to a trial court's determination of the historical facts" and to its "evaluations of credibility and demeanor").

Here, the State explained Fulbright's increased charge based on Elected Attorney's inexperience, her receipt of assistance from Experienced Attorney and Specialized Attorney, her consent to these more experienced prosecutors' recommendations regarding reindictments, and her increased confidence in the strength of the State's case. This explanation was "unrelated to [Fulbright's] exercise of his legal right[s]," *Hood*, 185 S.W.3d at 448–50, and Fulbright did not present any evidence to call it into question.[18] Rather, he insisted that, as a matter of law, such explanation was insufficient to overcome the vindictiveness presumption. And he makes the same argument on appeal. According to him, the State could overcome the vindictiveness presumption only by showing that the increased charge relied on new

---

[18]Fulbright questioned the credibility of some aspects of Elected Attorney's explanation. For example, he noted that Elected Attorney's inexperience did not explain why Experienced Attorney had not indicted him for capital murder. But Elected Attorney identified other considerations as well, including the increased strength of and confidence in the State's case and Elected Attorney's never having charged anything under the capital murder statute. Ultimately, the trial court had the discretion to "decide[] . . . the credibility of the prosecutor's explanation." *Hood*, 185 S.W.3d at 448.

evidence or events such that "it was impossible to [have brought] the more serious offense at the time of the first trial." But a similar argument was raised in *Hood* and rejected by the Court of Criminal Appeals. *See id.*

There, Hood was convicted of aggravated sexual assault of a child, and after his conviction was reversed on appeal, the State reindicted him, adding two new enhancement paragraphs. *Id.* at 446. Hood moved to quash the reindictment based on prosecutorial vindictiveness, but the State attributed the new enhancements to human error, stating that they were "an omission from the very first indictment and should have been charged from the beginning." *Id.* at 446–47. On appeal, Hood argued—much as Fulbright does here—that the only way for the State to overcome the vindictiveness presumption was by tracing its new enhancement paragraphs to "identifiable conduct by [the defendant] occurring after the first trial." *Id.* at 448–49. But the Court of Criminal Appeals said no.

The Court clarified that, although prior case law had contemplated the State's overcoming the vindictiveness presumption with evidence of "identifiable conduct . . . occurring after the first trial," such comments did not establish an exclusive means of overcoming the vindictiveness presumption. *Id.* at 448–50. Rather, the State need only provide an "objective explanation" that is "unrelated to the defendant's exercise of his legal right." *Id.* And, in Hood's case, the prosecutor had not "merely den[ied that] his state of mind was motivated by vindictiveness" but had also explained that the new enhancement paragraphs were based on a "mistake or

16

oversight," with "no indication that the oversight explanation was influenced by emotion or personal opinion." *Id.* at 450. The trial court was entitled to believe this objective explanation, and it was sufficient to overcome the vindictiveness presumption. *Id.*

The same is true here. Elected Attorney attributed Fulbright's reindictments to the changes in prosecutorial experience, evidence, and confidence, and she confirmed that the reindictments were "not [at] all" motivated by vindictiveness." *See id.* As in *Hood*, Elected Attorney "d[id] not merely deny h[er] state of mind was motivated by vindictiveness" but explained the thought process behind the changes with "no indication that the . . . explanation was influenced by emotion or personal opinion." *Id.* And "the trial court was entitled to believe the prosecutor's explanation." *Id.* at 448–50. Because this explanation was wholly unrelated to Fulbright's assertion of his legal rights, it was sufficient to rebut any presumption of prosecutorial vindictiveness. *Id.*; *see Ramirez v. State*, No. 13-24-00054-CR, 2025 WL 2355176, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 14, 2025, no pet.) (mem. op., not designated for publication) (holding that, even if presumption of prosecutorial vindictiveness arose based on State's increasing defendant's charge to capital murder after defendant rescheduled trial, the State overcame the presumption by explaining that its "decision to reindict stemmed from its trial preparation" in which it spoke with witnesses and re-evaluated the evidence).

We overrule Fulbright's prosecutorial vindictiveness complaint.

17

**B.     Sufficiency:  There was sufficient evidence of Fulbright's mens rea.**

Fulbright next asserts that, even if his capital murder charge was not constitutionally flawed, the evidence was insufficient to show that he "possessed the requisite mental state" for capital murder, i.e., that he intentionally or knowingly caused Opal's death.  *See* Tex. Penal Code §§ 6.03(a), (b), 19.02(b)(1), 19.03(a)(8).

To convict a defendant for capital murder, the jury must find beyond a reasonable doubt that the defendant, among other things, "intentionally or knowingly cause[d] the death of an individual."  *Id.* §§ 19.02(b)(1), 19.03(a)(8).  A person commits capital murder "intentionally" when it is his conscious objective or desire to cause death, and he commits it "knowingly" when he is aware that his conduct is reasonably certain to cause death.  *See id.* § 6.03(a), (b).  "[I]ntent and knowledge . . . are almost always proven through circumstantial evidence."  *Jackson v. State*, No. 02-24-00050-CR, 2025 WL 1599969, at *3, *5 (Tex. App.—Fort Worth June 5, 2025, no pet.) (mem. op., not designated for publication).

To determine whether there was sufficient circumstantial evidence to support a jury finding that a defendant acted intentionally or knowingly, we review the record in the light most favorable to the verdict and ask whether any rational jury could have found the mens rea element beyond a reasonable doubt.  *Fraser v. State*, 726 S.W.3d 253, 258 (Tex. Crim. App. 2025); *Louis v. State*, 393 S.W.3d 246, 248–49 (Tex. Crim. App. 2012).  We presume that the jury resolved conflicting inferences in favor of the verdict, keeping in mind that "the jury may use common sense, common knowledge,

personal experience, and observations from life when drawing inferences" from the evidence. *Fraser*, 726 S.W.3d at 258; *see Jackson*, 2025 WL 1599969, at *2.

Fulbright argues that, even though there was evidence that he inflicted "[s]evere . . . , inappropriate punishment for a child [of Opal's] age," no rational jury could have found that he knew his conduct was reasonably certain to kill Opal. According to him, because Opal had "a series of [head] injuries," it was unlikely that he knew any given blow would be fatal. And he further emphasizes that he "had not before spent any significant time around children" prior to Susan and Opal's moving in with him. But these contentions ignore both the record and common sense.

First, contrary to Fulbright's claim that Opal's numerous injuries cast doubt on his mens rea, both he and Susan traced Opal's collection of fatal head injuries to a single abusive episode:

- Susan testified that, a few days before she and Fulbright brought Opal to the hospital, Fulbright "punched [Opal] really hard in the head," then he shoved Opal in the closet, "pushing her chest . . . hard . . . [and] she hit her head . . . [o]n the back of the closet."

- In Fulbright's videotaped interview with law enforcement, he explained that, after he hit Opal in the face with such force as to hurt his hand, she began having seizures, and she fell without catching or bracing herself, seemingly losing consciousness. He stated that, while the large bruise on Opal's temple was from him hitting her, many of the other bruises on her head were from her repeatedly falling afterward.

- Susan, too, testified that, after Fulbright hit Opal in the head, Opal was not able to hold herself up and began having more frequent seizures.

19

- In one of Fulbright's jailhouse phone calls, he stated that many of Opal's injuries were from her "falling over at least 100 times after [he hit her in the head]."

- The medical examiner confirmed that the abusive episode described by Susan and Fulbright—Fulbright's hitting Opal so hard that he thought he hurt his hand then pushing her into a closet such that she hit her head—could have been the cause of Opal's collection of fatal head injuries.

A reasonable jury presented with this evidence could have concluded that Fulbright's episode of abuse caused Opal's collection of fatal head injuries and that he knew those actions were reasonably certain to kill her.[19]

Second, Fulbright's implicit claim that he was ignorant of appropriate child discipline—his emphasis on "ha[ving] not before spent any significant time around children"—is unpersuasive. Fulbright testified that he had "nieces and nephews [and] a few previous relationships with women that ha[d] kids," and that he had witnessed children being disciplined before. He told the jury that he considered timeout—not spankings or anything more severe—to be the appropriate form of discipline for a two-and-a-half-year-old child. And, in attempting to blame Susan for Opal's injuries, he claimed that he had tried to intervene in Susan's alleged abuse and had argued with her about "[w]hether [her alleged abuse] was the correct form of discipline to use on a

---

[19]Fulbright's statements to law enforcement indicated that he, too, knew that Opal's injuries traced back to his actions. A law enforcement detective described how, when he expressed doubt at Fulbright's excuses for Opal's injuries, Fulbright "drop[ped] his head" and "sa[id], I did it, I did this to her." And in Fulbright's videotaped interview, he admitted that he had told Susan to "give it a few days [and] it [would] pass" because he was afraid of having to explain Opal's injuries as "[he] knew that [he had] messed up."

20

child that young." Thus, a rational jury could have concluded that Fulbright knew his so-called punishment of Opal was beyond the bounds of normal child discipline.

Third, the jury could have inferred Fulbright's knowledge based on common sense. *See Fraser*, 726 S.W.3d at 258 ("[T]he jury may use common sense, common knowledge, personal experience, and observations from life when drawing inferences."). A rational jury could have concluded that, when an adult male hits a 26-pound, two-and-a-half-year-old girl in the face with enough force that he fears having broken his hand, then he pushes the toddler into a closet with enough force that she hits her head against the back wall, the adult knows that his actions are reasonably certain to be fatal. *See Louis*, 393 S.W.3d at 251 (explaining that, "[b]y applying its own common-sense understanding of the parameters of parental discipline, the jury could have reasonably disregarded all of the evidence purporting that appellant believed this was appropriate discipline"); *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) (holding evidence sufficient to show mens rea element of murder, noting that "[t]he extent and severity of the injuries do not reflect a simple spanking" of the three-year-old child, and explaining that "[a]ny violent assault on such a young child may be reasonably expected to cause death").

All told, both the evidence and the common-sense inferences from it allowed a reasonable jury to conclude, beyond a reasonable doubt, that Fulbright was aware that his conduct was reasonably certain to kill Opal. *See* Tex. Penal Code § 6.03(b); *cf. Louis*, 393 S.W.3d at 251–52 (holding evidence insufficient to support capital murder

21

conviction stemming from child discipline when evidence showed that appellant's abuse "became fatal [only] in combination with the later injuries separately caused by the child's mother," who subsequently abused the child).

We overrule Fulbright's sufficiency complaint.

## C. Evidentiary Rulings: The challenged rulings were not erroneous.

In his final appellate issue, Fulbright complains that the trial court erred by (1) admitting the Facebook records based on deficient business records certificates and (2) excluding portions of Dr. Sabine's testimony.

To prevail on these evidentiary complaints, Fulbright must attack all independent grounds supporting the rulings, and he must show that the trial court abused its discretion in relying on any of the independent grounds for the rulings. *See Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (reviewing admission of text messages over authenticity objection for an abuse of discretion); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) (reviewing admission of social media records over authenticity objection for an abuse of discretion); *Jaen v. State*, No. 02-23-00260-CR, 2025 WL 2088286, at *8–9 (Tex. App.—Fort Worth July 24, 2025, no pet.) (mem. op., not designated for publication) ("If a trial court's ruling can be sustained on any independent ground, an appellant must challenge all grounds on appeal.").

### 1. Facebook records

Regarding the Facebook records, Fulbright argues—as he did in the trial court—that the accompanying business records certificates were deficient. According

22

to Fulbright, the certifying Facebook employees did not provide the necessary confirmation that the records' contents were made "by, or from information transmitted by, persons with knowledge of the matters set forth," and they could not have provided this vital confirmation because the Facebook content shown in the records was created by Facebook users.[20]  Tex. R. Evid. 902(10)(B).  But this misunderstands the limited purpose of the business records certificates in this case.

For evidence to be admissible, the proponent must make a prima facie showing that it is authentic, i.e., that the evidence is what the proponent claims it to be.  *See* Tex. R. Evid. 901(a); *Tienda*, 358 S.W.3d at 638 (noting that authenticity is ultimately an issue for the jury while "[t]he preliminary [admissibility] question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic").  When the relevant evidence is from an organization's

---

[20]Because the challenged Facebook records—State's Exhibits 12 and 13—were voluminous, portions of them were admitted as separate, duplicative exhibits. Fulbright offered many of these duplicative Facebook exhibits, and he did not object to the admission of the State's duplicative exhibits.  Thus, the portions of State's Exhibits 12 and 13 that were duplicated elsewhere could not have harmed Fulbright. *See Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) ("[W]hen a court has overruled an objection to evidence, the ruling usually will not be reversible error when the same evidence is subsequently admitted without objection.").  Despite this, on appeal, Fulbright does not acknowledge that portions of State's Exhibits 12 and 13 were duplicated elsewhere.  Nor does he identify which portions of State's Exhibits 12 and 13 he believes caused him harm.  To the contrary, even though Exhibits 12 and 13 fill more than 11,000 pages, Fulbright does not cite a single page of them.  *Cf.* Tex. R. App. P. 38.1(i).

23

records, generally, the proponent can meet its prima facie authentication burden with an accompanying affidavit confirming that the evidence qualifies as a business record, i.e., that it (1) reflects "[a] record of an act, event, condition, opinion, or diagnosis"; (2) "was [made and] kept in the course of a regularly conducted business activity"; (3) was "made at or near the time of each act, event, condition, opinion, or diagnosis set forth"; and (4) was "made by, or from information transmitted by, persons with knowledge of the matters set forth." Tex. R. Evid. 803(6), 902(10)(B).

A business records affidavit does not conclusively negate every conceivable authentication challenge that could be leveled against the record, though. *See generally* Tex. R. Evid. 902(10). Nor is it required to do so. *See id.* (listing specific, limited requirements for business records affidavit); *Ryder v. State*, 581 S.W.3d 439, 454 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (reviewing authenticity challenge to Facebook records and reiterating that "[t]he proponent of the evidence does not need to rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be" (internal quotation marks omitted)); *see also Arefi v. State*, No. 02-18-00234-CR, 2019 WL 3955214, at *3 (Tex. App.—Fort Worth Aug. 22, 2019, pet. ref'd) (mem. op., not designated for publication) (discussing parallel hearsay exception for business records and explaining that the sponsoring witness "need not have personal knowledge of the specific contents of the records . . . nor does he have to be the creator of the record" as long as he has "personal knowledge of the manner in which the records were prepared"). A 911 call

recording, for example, might be accompanied by a business records affidavit, even though the defendant might question whether the caller was who he purported to be or had personal knowledge of the emergency he reported. The business records affidavit has a limited role in this sense. And "as with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." *Tienda*, 358 S.W.3d at 639.

Here, the Facebook business records certificates served the limited purpose of confirming that the Facebook documents were accurate representations of the user profiles, messages, and activities logged on Facebook's system—just as the documents purported to be. *See* Tex. R. Evid. 901(a). So, when the Facebook employees confirmed that the records "were made . . . by the automated systems of Facebook in the course of regularly conducted activity," they were verifying that the accompanying Facebook records were made "by . . . persons [i.e., an automated system] with knowledge of the matters set forth." Tex. R. Evid. 902(10)(B)(4); *see Taylor v. State*, No. 02-25-00121-CR, 2026 WL 1041870, at *9–12 (Tex. App.—Fort Worth Apr. 16, 2026, no pet. h.) (mem. op., not designated for publication) (reviewing similar statement in Instagram business records affidavit). Contrary to Fulbright's contentions, the certificates did not purport to vouch for the factual accuracy of the user-provided content within the Facebook records. And their failure to do so did

not undermine the documents' status as business records, nor did it render the certificates deficient for their limited purpose. *See* Tex. R. Evid. 902(10)(B).

This is not to say that the Facebook records were not subject to attack based on other authenticity issues—such as Fulbright's or Susan's authorship of the Facebook messages attributed to them. But Fulbright did not dispute that he and Susan were behind the Facebook messages attributed to them.[21] *See Tienda*, 358 S.W.3d at 639–40 (discussing authentication of social media and recognizing that, "[i]n some cases, the purported sender [of an electronic message] actually admitted to authorship"). Nor does Fulbright raise that allegation on appeal. Rather, his narrow complaint is that, because the Facebook documents contained user-created content, and because the accompanying certificates could not speak to the users' personal

---

[21]Even if Fulbright had challenged his or Susan's authorship of the Facebook content, Susan's testimony—confirming their Facebook user names and frequent use of the platform—along with the records' distinctive characteristics—such as the photographs of Susan, Fulbright, and Opal—linked them to the records. *See Butler*, 459 S.W.3d at 603 (noting that, in ruling on the admission of electronic communications, "courts must be especially cognizant that such matters may sometimes be authenticated by distinctive characteristics found within the writings themselves"); *Tienda*, 358 S.W.3d at 642–47 (holding that internal content of MySpace postings provided sufficient circumstantial evidence to link posts to defendant when defendant disputed authorship); *Murray v. State*, 534 S.W.3d 540, 545–46 (Tex. App.—San Antonio 2017, no pet.) (holding that internal content of Facebook records provided sufficient evidence of authorship when records were admitted with business records affidavit but defendant questioned content's authorship as well); *see also Tienda*, 358 S.W.3d at 647 (discussing methods of authenticating social media posts and noting that "the proponent could produce information that would link the profile to the alleged person from the appropriate employee of the social networking website corporation").

knowledge of the content, the business records certificates were necessarily deficient. Because this challenge misunderstands the certificates' limited role, we overrule it.

### 2. Dr. Sabine's testimony

Finally, regarding the trial court's exclusion of portions of Dr. Sabine's testimony, Fulbright does not challenge all of the independent grounds supporting the trial court's ruling.

Generally, if the trial court excludes evidence on multiple grounds, the appellant must challenge each independent ground for the ruling; otherwise, the trial court's ruling will be sustained on the unchallenged grounds. *See Jaen*, 2025 WL 2088286, at *9; *Petty*, 2022 WL 4545532, at *5; *see also State v. Copeland*, 501 S.W.3d 610, 614 (Tex. Crim. App. 2016).

Here, the State raised several objections to Dr. Sabine's testimony, including that his testimony violated Texas Rule of Evidence 403, *see* Tex. R. Evid. 403, and that Fulbright had failed to timely disclose the character-conformity aspects of his testimony about Fulbright. When the trial court sustained the State's objections, it expressly stated that Dr. Sabine's testimony regarding Susan would be "more prejudicial than probative" and that his testimony regarding Fulbright would be "more confusing" than relevant. *See id.* ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."). Then, when Fulbright sought clarification regarding the character-conformity testimony in particular, the trial court

again sustained the State's objections, which included Fulbright's failure to give timely notice of the testimony. Yet, on appeal, Fulbright does not challenge these grounds for the trial court's ruling. He mentions the trial court's Rule 403 finding without addressing it, and he does not acknowledge the notice issue at all.

Because there are unchallenged, independent grounds for the trial court's evidentiary ruling, we cannot conclude that the trial court abused its discretion. *See Jaen*, 2025 WL 2088286, at *9–10 (affirming trial court's ruling on the admission of video recording when the trial court enunciated two grounds for its ruling and the appellant challenged only one on appeal); *Petty*, 2022 WL 4545532, at *5–6 (affirming trial court's ruling on outcry witness when State presented two independent grounds for the ruling and the defendant challenged only one on appeal); *Marsh v. State*, 343 S.W.3d 475, 478–79 (Tex. App.—Texarkana 2011, pet. ref'd) (rejecting challenge to exclusion of evidence when appellant attacked one ground for the ruling but failed to address second ground, namely, that the evidence was more prejudicial than probative). Thus, we overrule Fulbright's challenge to the trial court's ruling limiting Dr. Sabine's testimony.

### III.  Conclusion

Having overruled all of Fulbright's appellate issues, we affirm the trial court's judgment.  *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 28, 2026